## FARNUM'S PETITION.

School districts are public corporate bodies, created, by statute, as an instrument in the scheme of public instruction, and their existence, as well as all their public corporate functions, are dependent on the will of the legislature.

Those rights of the inhabitants of school districts, which arise out of and depend upon the corporate existence of the district, are of a public and political nature, like the right which all citizens have in the existence of general laws, and are therefore liable to be taken away by the legislature.

June 26, 1871, the superintending school committee of C. made a location of a school-house in district No. 13 in that town, which, as the law then stood, was final and conclusive upon all parties for five years. On the 14th of July, in the same year, the legislature passed an act granting an appeal to the county commissioners by ten or more voters aggrieved by the location of the committee; providing also that the act should "apply to cases where school-houses have already been located, as well as to cases where such location shall hereafter be made." Thereupon the county commissioners were called out, and changed the location established by the committee. It was *held*, that the act of July 14, 1871, is not repugnant to the constitution, and that the location made by the county commissioners must stand.

PETITION by Simeon Farnum for a writ of *certiorari*. The facts sufficiently appear in the opinion of the court.

A. & F. A. Fowler, for the petitioners, cited and commented on *Merrill* v. *Sherburne*, 1 N. H. 213; *Towle* v. *Eastern Railroad*, 18 N. H. 547; *Woart* v. *Winnick*, 3 N. H. 481; *Roby* v. *West*, 4 N. H. 287; *Bristol* v. *New Chester*, 3 N. H. 534; *Dow* v. *Norris*, 4 N. H. 16; *Clark* v. *Clark*, 10 N. H. 386; *Gilman* v. *Cutts*, 23 N. H. 382; *Willard* v. *Harvey*, 24 N. H. 344; *Adams* v. *Hackett*, 27 N. H. 294; *Lakeman* v. *Moore*, 32 N. H. 413; *Rich* v. *Flanders*, 39 N. H. 314; *Society* v. *Wheeler*, 2 Gall. 139; *Hedger* v. *Rennaker*, 3 Met. (Ky.) 255; *Winter* v. *Jones*, 10 Georgia 190.

Flint, on the same side, referred to and discussed N. H. Bill of Rights, art. 23; *Dartmouth College* v. *Woodward*, 1 N. H. 122; *Bristol* v. *New Chester*, 3 N. H. 532; *Clough* v. *Unity*, 18 N. H. 75; *Kennett's Petition*, 24 N. H. 139; *Pembroke* v. *Epsom*, 44 N. H. 113; *Fletcher* v. *Peck*, 6 Cranch 135; *Merrill* v. *Sherburne*, 1 N. H. 199; *Lakeman* v. *Moore*, 32 N. H. 410.

*Marshall & Chase,* for school district number thirteen, referred to *Boston* v. *Cummins,* 16 Geo. 102; *Cutts* v. *Hardee,* 38 Geo. 350; *People* v. *S. F. R. R. Co.,* 35 Cal. 606; *Calder* v. *Bull,* 3 Dallas 395; *Dartmouth College* v. *Woodward,* 4 Wheat. 625; *Rich* v. *Flanders,* 39 N. H. 312; Const. N. H., art. 85; Gen. Stats., ch. 78, sec. 14; Angel & Ames on Corp., secs. 23, 24; *Dartmouth College* v. *Woodward,* 1 N. H. 116: *School District* v. *Wood,* 13 Mass. 193; *Johnson* v. *Dole,* 4 N. H. 480; *Foster* v. *Lane,* 30 N. H. 315; *N. Yarmouth* v. *Skillings,* 45 Me. 133; *Mayor, &c., of Baltimore* v. *State,* 15 Md. 376; *Memphis* v. *So. Memphis,* 11 Humph. 558; *Montpelier* v. *E. Montpelier,* 29 Vt. 18; *Granby* v. *Thurston,* 23 Conn. 419; *Bristol* v. *New Chester,* 3 N. H. 532; *Berlin* v. *Gorham,* 34 N. H. 275; A. & A. on Corp., sec. 31, note 4; *School District* v. *Smart,* 18 N. H. 268, 273; *East Hartford* v. *Hartford Bridge Co.,* 10 How. 534; *Eustis* v. *Parker,* 1 N. H. 275; Laws of 1867, chaps. 62, 63; Laws of 1868, chaps. 6, 24, 76; Laws of 1869, ch. 109; Laws of 1871, ch. 37, 108; *De Cordova* v. *Galveston,* 4 Tex. 470; *Rich* v. *Flanders,* 39 N. H. 319; *Leathers* v. *Shipbuilders' Bank,* 40 Me. 386; *Colony* v. *Dublin & Marlborough,* 32 N. H. 432; *Exeter* v. *Stratham,* 2 N. H. 102; *Lewiston* v. *North Yarmouth,* 5 Greenl. 66; *Winchester* v. *Corinna,* 55 Me. 9; *Allen* v. *Archer,* 49 Me. 346; *State* v. *St. Louis Co. Ct.,* 34 Miss. 546; *Kennett's Petition,* 24 N. H. 139; *Merrill* v. *Sherburne,* 1 N. H. 213; *Towle* v. *Eastern R. R.,* 18 N. H. 547; *B. & M. R. R.* v. *Cilley,* 44 N. H. 578.

LADD, J.   This is a petition for a writ of *certiorari* to School District No. 13, in Concord, to certify their records as to the location of their school-house, and that the doings of the county commissioners be adjudged erroneous and void.

On the 26th day of June, 1871, the superintending school committee of Concord, after due notice to the parties, and hearing, decided upon a location for a new school-house in said district; and no question is made but that their action in the premises was in all respects conformable to law.

As the law stood at that time, this decision of the school committee was to be binding and conclusive upon all parties for the term of five years.   Gen. Stats., ch. 233, sec. 6.

July 14, 1871, an act was passed by the legislature providing that in case any ten or more voters of a school district are aggrieved by the location of any school-house by the superintending school committee, they may apply by petition to the county commissioners, who shall hear and determine the location thereof. It is further provided, in section 3, that the act shall apply to cases where school-houses have already been located by the school committee, as well as to cases where such location shall hereafter be made; and all acts and parts of acts inconsistent with this act are repealed.

Relying upon the express provisions of this statute, the passage of which is said to have been procured to meet this very case, a sufficient number of the voters of the district applied by petition to the county

commissioners; and the county commissioners have heard the parties, and determined a location for the house upon a different site from that selected by the committee; and the question before us now is, Which of these locations shall stand?

This is not the place for comment upon the evils of special legislation, or legislation based upon the supposed exigencies of a single case, and designed to relieve a single individual or corporation, even though such individual or corporation might otherwise suffer positive injustice and wrong. It is enough to say, that every right-minded citizen must regard with feelings of disapproval and alarm the introduction of a practice so liable to abuse, and, in any view, so fraught with mischief and danger. However just and necessary the enactment may appear, in view of the facts presented by the case for which it is framed, the next case that arises calling for an application of the law will necessarily present new facts; other and different rights, duties, and interests will be involved; and it then becomes apparent, as was observed by RICHARDSON, C. J., in *Woart* v. *Winnick*, 3 N. H., at p. 481, that no general principle can be safely established by an examination of its operation in one instance only.

We are not, however, to inquire into the motives of the legislature, or to judge of the wisdom of their acts. Our plain and simple duty is, to declare and apply the law, remembering that the constitution is the paramount law, and that any statute which is clearly repugnant to the provisions of that, instrument is not law, by reason of the superior and controlling authority of the mandate which it contravenes.

The petitioners contend that the act of July 14 is unconstitutional,— (1) because it grants a new trial in a case which had already been fully heard and finally determined by the competent and legally constituted tribunal having final jurisdiction in the premises, and so is an exercise of judicial power by the legislature, and (2) because it impairs and takes away vested rights acquired under existing laws, and creates a new obligation, imposes a new duty, and attaches a new disability in respect to transactions already past, and so is retrospective within the meaning of article 23 of the bill of rights.

What is the nature of the rights said to be invaded by the act? Clearly, they can only be (1) such as pertain to the school district, as a district by virtue of its corporate existence, and (2) such as pertain to the individuals composing the district, as individuals by virtue of their membership; for the act affects no right of property, and no privilege or immunity, except such as depend upon the permanence of the location of the school-house, as fixed by the school committee, for the period of five years.

The clause in the constitutions of 1783 and 1792, in regard to the encouragement of literature, in connection with the early legislation on the subject (see acts of June 18, 1789, December 13, 1804, December 25, 1805), show conclusively, if any such evidence were needed, that the framers of the constitution, as well as their contemporaries in the legislature, regarded the subject of education as one of public concern,

to be cherished, regulated, and controlled by the State; and the great multitude and variety of acts passed since show that no different view has ever been entertained.

First, the constitution enjoins the duty, in very general and comprehensive terms, on magistrates and legislators as one of paramount public importance. Then the legislature, in the early acts referred to, enjoin it upon towns, parishes, &c., such corporations being the only organized public bodies then in existence upon which their mandate could be laid, and which could be entrusted with the performance of the duty. Shortly after, towns were authorized to divide into school districts, and the inhabitants of such districts were invested with certain powers and duties, which made them *quasi* corporations like towns. Afterwards it was made imperative that towns should be divided into school districts. Districts were declared to be bodies politic and corporate, and their rights, powers, and duties more accurately and fully defined. Rev. Stats., tit. XI, of Public Instruction.

An examination of our statutes on this subject, from the time school districts are first spoken of down to the present time, shows that they are and always have been public corporate bodies, created by the legislature as a means and instrument in carrying out the public duty in reference to public instruction laid upon the legislature by the constitution. They exist only by authority derived from the legislature; their powers, duties, and obligations are such, and such only, as are derived directly from legislative enactment; and even after they have been created and invested with all the rights, privileges, and powers incident to such corporations, there can be no question but that the legislature may, without infringing any constitutional obligation or any right partaking at all of the nature of a contract, put an end to their corporate existence, and so, of course, strip them, as well as the inhabitants composing them, of all the rights, privileges, and powers they before possessed. This has been done in repeated instances in our larger towns, where all the districts have been abolished at once, and the city invested with the powers, obligations, &c., of a single school district in addition to its other corporate powers; and nobody, so far as we are aware, ever thought of calling in question the authority of the legislature to pass such an act.

It would seem to follow, that the inhabitants of a school district have no rights in the existence or in any of the corporate functions of the district, which can be regarded as vested rights, or which can be set up as beyond legislative control. The authority of the legislature in the premises being supreme, any such vested rights in the district as a body, or in the inhabitants composing it as individuals, would be inconsistent with that authority in the legislature, and hence cannot exist. Authorities in which this doctrine is more or less distinctly recognized are very numerous. In addition to those cited by defendants' counsel in their brief, see *People* v. *Morris*, 13 Wend. 325; *Ayres* v. *The Methodist Episcopal Church*, 3 Sand. 351; *Matter of the Reci-*

*procity Bank,* 22 N. Y. 9; *Phillips* v. *Mayor of New York,* 1 Hilt. 483; *People* v. *Mayor of New York,* 25 Wend. 680; *Bloomer* v. *Stolley,* 5 McLean 161; *Eustis* v. *Parker,* 1 N. H. 275; PERLEY, C. J., in *Colony* v. *Dublin,* 32 N. H. 432.

We are unable to see that the cases of *Merrill* v. *Sherburne,* 1 N. H. 199, and *Towle* v. *The Eastern Railroad,* 18 N. H. 547, relied on by counsel for the petitioners, have any important bearing on the present case. Those cases merely enunciate the familiar doctrine that private rights which have become vested cannot be taken away or destroyed by the legislature; and that the legislature cannot exercise judicial powers by granting a new trial of a civil cause between private parties, each of them being expressly guarded, in terms quite unequivocal, so as to furnish no countenance to anything more.

Section 6 of chapter 233 of the General Statutes provides, that the decision of the school committee and certain other town officers shall, in certain cases, be binding for five years. The act of July 14, 1871, expressly repeals that part of this section relating to the location of school-houses. The act also further provides, in effect, that the repeal shall go into immediate operation, so that the location of any school-house, which has been established for a less term than five years, may be changed. The intention of the legislature, as expressed in the act, is unequivocal. The general provision, that "the repeal of any act shall in no case affect any act done, or any right accruing, accrued, acquired, or established, or any suit or proceeding had or commenced in any civil case before the time when said repeal shall take effect" (Gen. Stats., ch. 1, sec. 34), can therefore have no application. Here was something more than the ordinary repeal of a statute. The effect of the repeal was defined by express enactment to be the release of locations already made. The issue, therefore, is not between two statutes seemingly in conflict, but clearly and distinctly between the repealing act of 1871 and the constitution. Was this repeal, and the immediate effect given to its operation, a judicial act within the inhibition of the constitution? We think not. It is true, it unsettled locations which the law before made conclusive for five years, and granted another hearing before a different tribunal in a matter once put at rest by the judgment of a tribunal which, at the time of the judgment, was invested with final jurisdiction in the premises. But we think the answer to these objections, which at first view appear so formidable, is found in the nature of the rights affected by the act. School districts being *quasi* corporations, like towns, called into existence by the legislature as instruments in the plan of public instruction, all their functions are of a public character; their property is public property; all the rights of their inhabitants, which come from the corporate existence of the district, are essentially political.

That such public corporations, deriving their existence, and all their powers, privileges, and rights, from the legislature, and charged with all their duties and obligations by the same superior power, are subject to legislative control, has been so often decided by the courts, and is so

generally laid down in all the books, that the doctrine may be regarded as quite elementary, at least in the United States.    Angell & Ames on Corp., sec. 24; 1 Gr. Ev., sec. 331; 2 Kent Com. 305, and numerous cases cited in notes;—see, also, authorities collected in note to *Todd* v. *Birdsall*, 1 Cowen 260.

Here, the legislature had made a rule, that when the location of a school-house was fixed by the committee it should remain for five years. Their authority to pass such an act cannot be questioned.    It was, however, a mere legislative decree.    It rested upon no consideration; it came into existence upon the call of no absolute vested right, and it created no new right.    By the exercise of their mere will, the legislature established a regulation where none existed before.    The privileges and benefits conferred by it did not differ in character from those conferred upon the citizen by other wholesome public laws.    It was evidently designed to secure the inhabitants of school districts against some of the disquiet, vexation, and strife which so often attend their efforts to build a new school-house.    Still, it was purely an act of public legislation, and, however convenient and beneficial to the people of the State, we are unable to see wherein the legislature transcended their constitutional power in repealing it any more than they did in bringing it into existence.

Judge COOLEY says,—"In organized society, every man holds all he possesses, and looks forward to all he hopes for, through the aid and protection of the laws; but, as changes of circumstances and of public opinion, as well as other reasons of public policy, are all the while calling for changes in the laws; and as these changes must influence more or less the value and stability of private possessions, and strengthen or destroy well-founded hopes; and as the power to make very many of them could not be disputed without denying the right of the political community to prosper and advance, it is obvious that many rights, privileges, and exemptions, which usually pertain to ownership under a particular state of the law, and many reasonable expectations, cannot be regarded as vested rights in any legal sense."    Cooley Const. Lim. 358.    We think the right of these petitioners in the continuance of the law, providing that locations once made should not be changed for five years, was no greater than the right of other citizens in the permanence of other public laws, and therefore that the 37th article of the bill of rights was not infringed either by the repeal, or by the clause giving the repeal immediate effect.

This seems to furnish a conclusive answer to the objection that the passage of the law of 1871 was repugnant to the constitution, on the ground that it was a judicial act by the legislature; for, after the law securing the location in one place for five years was repealed, it was most clearly competent for the legislature to provide a different mode and a new tribunal for settling the location.

The idea that the rights of the petitioners rest in contract, and are so within the protection of the constitution of the United States against legislative encroachment, seems to us entirely untenable.    *Sturges* v.

*Crowninshield*, 4 Wheat. 122; *Dartmouth College* v. *Woodward*, 4 Wheat. 518. In the latter case, Chief Justice MARSHALL says,—"This provision of the constitution never has been understood to embrace other contracts than those which respect property or some object of value, and confer rights which may be asserted in a court of justice." " In order, therefore, that the prohibition should apply, it must appear that the subject-matter is a contract relating to property or some object of value, and which imposes an obligation capable in legal contemplation of being impaired." Potter's Dwar. Stat. 477.

The rule is not clearly nor correctly stated in the plaintiff's brief, that " a constitutional act of the legislature is equivalent to a contract, and when performed is a contract executed."

What would be claimed to be performance of a public act of the legislature is not very clear. If the meaning be that after the people, or some one or more of the people, have made plans, expended money, or incurred expense, relying upon the provisions of the act, and trusting that it will be allowed to remain in force, the law thereupon becomes equivalent to a contract executed, so that it cannot be repealed, it would follow that the great mass of our public statutes must remain forever as they are now. No legislature could alter or repeal them without breaking numberless contracts which have been created and consummated by acts of obedience on the part of citizens, who would thus acquire vested rights which could not be legally interfered with. No such rule, of course, exists. " It is well established law that the individual citizen, with all his rights to protection, has no such vested interest in the existing laws of the State as precludes their amendment or repeal by the legislature; nor is there any implied obligation on the part of the State to protect its citizens against incidental injury occasioned by change in the law. Potter's Dwar. Stat. 472. The rule is, that " a constitutional act of the legislature, *which is equivalent to a contract*, and is perfected, requiring nothing further to be done in order to its entire completion and perfection, is a contract executed, and whatever rights are thereby created, a subsequent legislature cannot impair." *Ib.* 477; *People* v. *Platt*, 17 Johns. 195; *Dartmouth College* v. *Woodward*, 4 Wheat. 518; *Sturges* v. *Crowninshield*, 4 Wheat. 204.

That the right to have the decision of a tribunal, to whom has been delegated the duty of locating a public school-house, stand unchanged for a specified term of years, does not come within the definition of Chief Justice MARSHALL, or any other correct definition of a contract such as is contemplated by the constitution of the United States, seems to us quite too plain for argument.

But it is said, in substance, by the petitioners, that, admitting this to be so, still the legislature cannot take away or impair the right because it had been previously asserted by appropriate action in a tribunal having jurisdiction of the case. In other words, the argument seems to be that the right of the petitioners rests upon and is fortified by a decision having the force of a judicial decree or judgment, and is, therefore, beyond the reach of legislative interference or control. It is

not very clear how a mere public political right, created and conferred by the legislature, is made more sacred or inviolable by the fact that the mode and conditions of its enjoyment have been determined by a tribunal charged by the legislature with that duty, nor how such right derives any additional muniment from the decision applying it. But it is not necessary to inquire whether such a position can be sustained or not, because we think the whole force of the argument fails for another reason, namely, that it was not the decision of the school committee that fixed the period for which the location should remain unchanged. The only matter they were authorized to determine was the location. Whatever right the petitioners might have that the location should not be disturbed for five years, rested entirely upon the statute and not on the decision. That statute, we have seen, the legislature might repeal, and when they did so, what becomes of the right? The very stock upon which it was grafted is cut down, and the right goes with it, as all municipal rights go when the statute on which they depend is repealed.

With this view it is not necessary to go further into the inquiry what rights are to be regarded as vested, in such sense as to come within the protection of the constitution against legislative encroachment. In general, they will be found to be private rights relating to property,—one leading object for which the constitution was established being the protection of private property.

The remaining point is, that this act is a retrospective act, for the decision of a civil cause, within the 23d article of the bill of rights.

In *Woart* v. *Winnick*, 3 N. H. 473, a construction was placed upon this article, which has been considered accurate and satisfactory ever since. It was there said that " it was intended to prohibit the making of any law prescribing new rules for the decision of existing causes, so as to change the ground of action or the nature of the defence. See, also, *Rich* v. *Flanders*, 39 N. H. 304, and cases there commented upon.

The word " cause " is defined by Bouvier to be,—" A suit or action ; any question, civil or criminal, contested before a court of justice ; " and " civil action " is defined to be (at common law),—" An action which has for its object the recovery of private or civil rights, or compensation for their infraction." It would be hardly compatible with these legal definitions, any more than with the popular notion of what constitutes a civil cause, to hold that the location of a public schoolhouse comes within the meaning of the term as used in the bill of rights. But, even were it otherwise, we think the construction put upon the clause by RICHARDSON, C. J., in *Woart* v. *Winnick*, and ever since approved, is not met by the facts of the present case. It is argued that a new rule is prescribed for the decision of the case, in this,—that the act makes the dissatisfaction of ten or more voters in the district sufficient cause for changing the location determined by the school committee, whereas before its passage no such rule for deciding the location existed. The fallacy of this appears upon the slightest examination.

The act makes the dissatisfaction of ten or more voters cause for calling out the county commissioners, but no such absurdity appears as that such dissatisfaction shall be sufficient cause for changing the location. The commissioners might, without the shadow of a doubt, reaffirm the judgment of the school committee and locate the house in the same place, the dissatisfaction of ten voters to the contrary notwithstanding.

What were the rules for the decision of the case by which the school committee were bound to be governed? Evidently, the convenience and welfare of the people of the district. The county commissioners, in the discharge of the public duty with which they are charged by the act, were most clearly bound to be governed by exactly the same considerations. The same kind of evidence, comprising, probably, among other things, the geographical features and situation of the district, the location and character of the roads, the distribution of the inhabitants, &c., ought to govern each board in their decision. At all events, the act prescribes no new elements, no new rule by which the commissioners are to be governed. We think, therefore, that even were it admitted that the location was a civil cause, the act is not retrospective within the 23d article of the bill of rights, as that article has been repeatedly interpreted by the court. We have examined this case with considerable care, and are unable to find any ground upon which the act of July 14, 1871, can be held repugnant to the constitution. The result, therefore, is, that the petition           *Must be dismissed.*