Merrimack
No. 92-711

CLAREMONT SCHOOL DISTRICT & a.

v.

GOVERNOR & a.

December 30, 1993

*Shaheen, Cappiello, Stein and Gordon*, of Concord (*Andru H. Volinsky* and *Arpiar G. Saunders, Jr.* on the brief, and *Mr. Saunders*

orally), *Sulloway and Hollis*, of Concord (*John Burwell Garvey* on the brief), and *Edward Damon*, of Concord, on the brief, for the plaintiffs.

*Jeffrey R. Howard*, attorney general (*Leslie J. Ludtke*, senior assistant attorney general, on the brief and orally), for the State.

*New Hampshire Legal Assistance*, of Concord (*John E. Tobin, Jr.* and *Abigail Turner* on the brief, and *Mr. Tobin* orally), for Marie Ayer, Charles and Jeanne Watson, and John Bowler, as *amici curiae*.

*McLane, Graf, Raulerson & Middleton P.A.*, of Manchester (*Jack B. Middleton* and *Wilbur A. Glahn, III* on the brief), for Ralph Degnan Hough, President of the New Hampshire Senate.

*James F. Allmendinger*, of Concord, staff attorney, NEA-New Hampshire, by brief for NEA—New Hampshire, as *amicus curiae*.

*Theodore E. Comstock*, of Concord, general counsel, New Hampshire School Boards Association, by brief for New Hampshire School Boards Association, as *amicus curiae*.

*Douglas & Douglas*, of Concord (*Robert J. Rabuck* on the brief), for Granite State Taxpayers' Association and Granite State Legal Foundation, as *amici curiae*.

*John S. Lawton*, by brief, *pro se*, as *amicus curiae*.

■ BROCK, C.J. The Superior Court (*Manias*, J.) dismissed the plaintiffs' petition for injunctive relief and declaratory judgment for failure to state a claim upon which relief could be granted. The plaintiffs appeal the court's conclusion that the New Hampshire Constitution imposes no duty on the State to support the public schools. We hold that part II, article 83 imposes a duty on the State to provide a constitutionally adequate education to every educable child in the public schools in New Hampshire and to guarantee adequate funding. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

The plaintiffs are five "property poor" school districts and five school children and five taxpayers, one from each of the school districts. They filed a petition for declaratory judgment alleging, in six counts, that the system by which the State finances education violates the New Hampshire Constitution: in counts (1) and (2) that the State fails to spread educational opportunities equitably among its students and adequately fund education, both in violation of part II, article 83; (3) that the foundation aid statutes, RSA 198:27 through

33 (1989), unconstitutionally restrain State aid to public education by capping State assistance at eight percent; (4) and (5) that both the State school finance system and the foundation aid statutes deny plaintiffs equal protection; and (6) that the heavy reliance on property taxes to finance New Hampshire public schools results in an unreasonable, disproportionate, and burdensome tax in violation of part II, article 5 of the State Constitution.

Part II, article 83, adopted in 1784 as part of this State's Constitution, originally stated:

"[Art.] 83. [Encouragement of Literature . . .] Knowledge and learning, generally diffused through a community, being essential to the preservation of a free government; and spreading the opportunities and advantages of education through the various parts of the country, being highly conducive to promote this end; it shall be the duty of the legislators and magistrates, in all future periods of this government, to cherish the interest of literature and the sciences, and all seminaries and public schools, to encourage private and public institutions, rewards, and immunities for the promotion of agriculture, arts, sciences, commerce, trades, manufacturers, and natural history of the country; to countenance and inculcate the principles of humanity and general benevolence, public and private charity, industry and economy, honesty and punctuality, sincerity, sobriety, and all social affections, and generous sentiments, among the people."

The provision was amended in 1877 to prohibit money raised by taxation from being used by religious schools and again in 1903 to add language concerning control of corporations and monopolies.

The trial court granted the defendants' motion to dismiss each of the six counts. Its order states in part:

"New Hampshire's Encouragement of Literature Clause contains no language regarding equity, uniformity, or even adequacy of education. Thus, the New Hampshire Constitution imposes no qualitative standard of education which must be met. Likewise, the New Hampshire Constitution imposes no quantifiable financial duty regarding education; there is no mention of funding or even of 'providing' or 'maintaining' education. The only 'duty' set forth is the amorphous duty 'to cherish . . . public schools' and 'to encourage private and public institutions.' N.H. Const., pt. 2,

art. 83. The language of pt. 2, art. 83 is hortatory, not mandatory.

In view of the foregoing, the Court finds that the N.H. Const., pt. 2, art. 83 imposes no duty as set forth in count one to equitably spread educational opportunities and advantages or as set forth in count two to equitably and adequately fund education. Absent such a duty, counts one and two of the plaintiffs' petition fail to state a claim upon which relief can be granted, and therefore, both counts must be dismissed."

Because we conclude that the trial court's determination that the State had no constitutional duty to support public education so permeated its decision to dismiss counts one through five, we will, at this time, address only the question of whether part II, article 83 imposes such a duty. With respect to count six, because petitioners have not had an opportunity to develop a record in support of their claim, we remand that count to the trial court for its further consideration. Our narrow task, therefore, is to determine whether the trial court committed legal error when it concluded that no duty exists.

"In interpreting an article in our constitution, we will give the words the same meaning that they must have had to the electorate on the date the vote was cast." *Grinnell v. State*, 121 N.H. 823, 826, 435 A.2d 523, 525 (1981) (quotation omitted). In doing so, we must "place [ourselves] as nearly as possible in the situation of the parties at the time the instrument was made, that [we] may gather their intention from the language used, viewed in the light of the surrounding circumstances." *Warburton v. Thomas*, 136 N.H. 383, 387, 616 A.2d 495, 497 (1992) (quotation omitted).

Numerous state courts have in recent years decided cases challenging, on constitutional grounds, systems of financing public education. Most of those cases are of limited value to this court because the constitutional provisions at issue contain language dissimilar to ours and were adopted under circumstances different from those existing in New Hampshire in the 1780s. Massachusetts, however, presents an exception. Given that New Hampshire shares its early history with Massachusetts, that we modeled much of our constitution on one adopted by Massachusetts four years earlier, and that the Massachusetts Constitution contains a nearly identical provision regarding education, we give weight to the interpretation given that provision by the Supreme Judicial Court in *McDuffy v. Secretary of the Executive Office of Education*, 415 Mass. 545, 615 N.E.2d 516 (1993). *See Warburton v. Thomas*, 136 N.H. at 391, 616 A.2d at 500.

An obvious starting point in interpreting part II, article 83 is to determine what the particular words used meant in 1784: *"Encouragement*: Incitement to any action or practice, incentive; favour, countenance, support," T. SHERIDAN, A GENERAL DICTIONARY OF THE ENGLISH LANGUAGE 1780 (Scolbar Press 1967); *"Literature*: Learning; skill in letters," *id.*; *"Diffused*: Spread abroad, widespread; dispersed over a large area; covering a wide range of subjects," OXFORD ENGLISH DICTIONARY (2d ed. 1989); *"Generally*: So as to include every particular, or every individual," *id.*; *"Duty*: That to which a man is by any natural or legal obligation bound," SHERIDAN *supra*; *"Cherish*: To support, to shelter, to nurse up," SHERIDAN *supra*. *See also McDuffy*, 415 Mass. at 562 n.17, 615 N.E.2d at 525 n.17.

The Encouragement of Literature clause, incorporating the sense of these definitions, thus declares that knowledge and learning spread through a community are "essential to the preservation of a free government," and that "spreading the opportunities and advantages of education" is a means to the end of preserving a free, democratic State. The duty of ensuring that the people are educated is placed upon "the legislators and magistrates, in all future periods of this government," and that duty encompasses supporting all public schools:

> "The breadth of the meaning of these terms ('duty . . . to cherish'), together with the articulated ends for which this duty to cherish is established, strongly support . . . that the 'duty . . . to cherish . . . the public schools' encompasses the duty to provide an education to the people of the [State] . . . . [I]t is reasonable therefore to understand the duty to 'cherish' public schools as a duty to ensure that the public schools achieve their object and educate the people."

*McDuffy*, 415 Mass. at 564, 615 N.E.2d at 526.

■ We do not construe the terms "shall be the duty . . . to cherish" in our constitution as merely a statement of aspiration. The language commands, in no uncertain terms, that the State provide an education to all its citizens and that it support all public schools. Decisions of this court are consistent with this conclusion. *See In re Davis*, 114 N.H. 242, 243, 318 A.2d 151, 152 (1974) (State Constitution "imposes upon government the duty of providing for the education of its citizens"); *State v. Jackson*, 71 N.H. 552, 553, 53 A. 1021, 1022 (1902) ("the injunction 'to cherish the interest of literature'" intended as "more than a mere sentimental interest"); *Farnum's Pe-*

*tition*, 51 N.H. 376, 378–79 (1871) (constitution "enjoins the duty" to educate in "comprehensive terms . . . as one of paramount public importance"); *cf. Fogg v. Board of Education*, 76 N.H. 296, 299, 82 A. 173, 175 (1912) (where student claimed right to State-provided transportation, court noted that providing for education of children, through support and maintenance of public schools, has always been governmental duty resting on the State). To suggest that the language is not mandatory because other States' constitutions, many drafted over 100 years after ours, contain more concrete, tangible standards of quality of education and quantity of support is an analysis we cannot endorse.

An examination of the "surrounding circumstances" at the time the constitution was adopted also supports our conclusion that the framers and the general populace understood the language contained in part II, article 83 to impose a duty on the State to educate its citizens and support the public schools. *See Attorney-General v. Morin*, 93 N.H. 40, 43, 35 A.2d 513, 514 (1943). The Puritans who settled here were deeply committed to education. They emigrated "chiefly to enjoy and propagate their religion; but next to this . . . *to educate their children.*" N. Bouton, The History of Education in New Hampshire: A Discourse Delivered Before the New Hampshire Historical Society 3 (1833) (transcript available at the New Hampshire State Library). The New England Puritans are credited with "contribut[ing] most that was valuable for our future educational development, and establish[ing] in practice principles which have finally been generally adopted by our different States." E. CUBBERLEY, PUBLIC EDUCATION IN THE UNITED STATES 15 (1919).

Between 1641 and 1679, New Hampshire and Massachusetts were united as a single province. *See* MANUAL FOR THE GENERAL COURT 117 (1891). The first New England law on education was enacted in 1642, which ordered that all children should be taught to read. *See McDuffy*, 415 Mass. at 570 n.27, 615 N.E.2d at 529 n.27. In 1647, an act was passed by which public schools were established in New Hampshire. *McDuffy*, 415 Mass. at 571 n.28, 615 N.E.2d at 529–30 n.28. The 1647 law expressed the principles that private property was subject to public taxation for support of public schools, that schooling was to be provided for all children, and that the State would control education. "It can safely be asserted that these two Massachusetts laws of 1642 and 1647 represent not only new educational ideas in the English-speaking world, but that they also represent the very foundation stones upon which our American public school systems have been constructed." CUBBERLEY, *supra* at 18. In

1669, the towns of Portsmouth, Dover, and Exeter each contributed money to "aid in erecting a new edifice for Harvard College." Bouton, *supra* at 10. Such was deemed by those towns as "needful for the perpetuating of knowledge both civil and religious, among us, and our posterity after us." *Bouton, supra* at 10 (quotation omitted).

When New Hampshire became a separate province in 1680, it re-enacted the education laws of Massachusetts then in existence. In 1693, the New Hampshire Legislature enacted a law requiring the towns' selectmen to raise money by "an equal rate and assessment" on the inhabitants for the construction and maintenance of the schools "and allowing a Sallary to a School Master." G. BUSH, HIS-TORY OF EDUCATION IN NEW HAMPSHIRE 10–11 (1898); *see* Laws of New Hampshire, Vol. 1 Province Period 560–61 (1679–1702). A penalty was provided for failure to comply with the statute. BUSH *supra*. Similar laws were enacted in 1714, 1719, and 1721. BUSH *supra*.

The law of 1719 required every town having fifty householders or more to provide a schoolmaster to teach children to read and write, and in every town of 100 householders, a grammar school to be kept. Laws of New Hampshire, Vol. 2 Province Period 336–37 (1702–1745). A penalty was to be assessed for failing to comply with the law, to be paid "towards the Support of Such School or Schools within this Province where there may be most need." *Id.* The law of 1721 stated:

> "Whereas the selectmen of Sundry Towns within this Province often Neglect to provide Grammar Schools for their Respective Towns whereby their youths Loose much of their Time, to the great Hindrance of their learning, For Remedy whereof Be it Enacted . . . That Not only Each Town but each parish within this Province Consisting of one Hundred Families shall be Constantly Provided with a Grammar School . . . . And [if] any Such Town or Parish . . . is Destitute of a Grammar School for the space of one month, the Select-men . . . shall forfeit . . . the Sum of Twenty pounds for Every Such Neglect to be paid out of their own Estates, & to be applyed towards the Defraying the Charges of the Province[.]"

*Id.* at 358.

Although these laws required the towns to fund public education, Governor Wentworth made clear in an address to the Council Chamber of the House of Assembly, on April 13, 1771, that the duty to educate remained with the State: "Religion — Learning, and Obedience to the Laws, are so obviously the Duty & Delight of Wise Legislators, that their mention, justifies my Reliance on your whole

Influence being applied to inculcate, spread & Support their Effect, in ev'ry Station of Life." Governor Wentworth, Executive Papers & Correspondence (1771). It is also apparent from Governor Wentworth's subsequent message to the General Assembly on December 14, 1771, that the local town officials had failed to meet their duties under the prior laws and that corrective action was necessary by the State itself:

> "Among other important Considerations, The promoting of learning very obviously calls for Legislative Care. The Insufficiency of our present Laws for this purpose, must be too evident, seeing nine tenths of your Towns are wholly without Schools, or have such vagrant foreign Masters as are much worse than none: Being for the most part unknown in their principles & deplorably illiterate."

NEW HAMPSHIRE PROVINCIAL PAPERS VOL. VII 287 (1764–1776). The General Assembly replied on December 30, 1771:

> "We beg leave to observe that we think it very a'propos that you have by order of your message plainly pointed out the necessary [connection] between good Education & the prosperous state of the People — for as they by the constitution have a share in the Governmt it is certainly of importance they should be able to sustain the part they are to bear with honor to themselves & with prosperity to the State which without such an Education is hardly feasably But without detaining your Excellency with a long detail of particulars, it is with pleasure we observe the extensive care your Excellency discovers for the welfare of the people under your Governmt by pointing out many different things as the proper objects of their attention of the house, all which they will consider as other necessary affairs will permit and do what they shall after deliberate consultation."

*Id.* at 290–91.

Against this background, the constitutional convention began its work drafting the State Constitution in 1781. The contention that, despite the extensive history of public education in this State, the framers and general populace did not understand the language contained in part II, article 83 to impose a duty on the State to support the public schools and ensure an educated citizenry is unconvincing. Indeed, in 1795 Governor Gilman addressed the Senate and House of Representatives, stating:

> "The encouragement of Literature being considered by the Constitution as one of the important Duties of Legislators

and Magistrates, and as essential to the preservation of a free Government, will always require the care and attention of the Legislature."

Governor Gilman, Executive Papers & Correspondence (1795). To which the House and Senate replied:

"The encouragement of Literature is a sacred and incumbent Duty upon the Legislature. Possessing a Constitution of Government which is founded upon the broad basis of the natural rights of mankind, we feel on our part, the strongest obligation to revere, to cherish, and to support it. Without a competent share of information diffused generally through the community, the natural as well as the acquired rights, and the duties to which the social compact necessarily subjects us, must be imperfectly understood, and consequently will be liable to be perverted and neglected. We shall therefore most cordially embrace all proper measures to diffuse Knowledge and Information, to promote Literature and to cherish seminaries of Learning as the most direct and certain means to perpetuate to posterity that Constitution, which forms our Glory, our Safety, and our Happiness."

*Id.* This statement has significant probative value as an indication that the contemporary understanding was that part II, article 83 imposed a duty on the State to provide universal education and to support the schools.

■ We are unpersuaded by the State's argument that the fact that no State funding was provided at all for education in the first fifty years after ratification of the constitution demonstrates that the framers did not believe part II, article 83 to impose any obligation on the State to provide funding. *But see* W. GIFFORD, COLEBROOK "A PLACE UP BACK OF NEW HAMPSHIRE" 11 (1993) (resolution of Senate and House approved July 7, 1846, granting 10,000 acres of land to trustees of Colebrook Academy). "That local control and fiscal support has been placed in greater or lesser measure through our history on local governments does not dilute the validity" of the conclusion that the duty to support the public schools lies with the State. *McDuffy*, 415 Mass. at 606, 615 N.E.2d at 548. "While it is clearly within the power of the [State] to delegate some of the implementation of the duty to local governments, such power does not include a right to abdicate the obligation imposed . . . by the Constitution." *Id.*

■■ Having identified that a duty exists and having suggested the nature of that duty, we emphasize the corresponding right of the

citizens to its enforcement. For over two hundred years New Hampshire has recognized its duty to provide for the proper education of the children in this State. Since 1647, education has been compulsory in New Hampshire, and our constitution expressly recognizes education as a cornerstone of our democratic system. We must conclude, therefore, that in New Hampshire a free public education is at the very least an important, substantive right. *See Carson v. Maurer*, 120 N.H. 925, 931–32, 424 A.2d 825, 830–31 (1980); *cf. Horton v. Meskill*, 195 Conn. 24, 486 A.2d 1099 (1985). The right to an adequate education mandated by the constitution is not based on the exclusive needs of a particular individual, but rather is a right held by the public to enforce the State's duty. Any citizen has standing to enforce this right. *See Fogg v. Board of Education*, 76 N.H. 296, 82 A. 173.

We do not define the parameters of the education mandated by the constitution as that task is, in the first instance, for the legislature and the Governor. There is a wealth of historical data upon which the legislature and the Governor may choose to draw in the pursuit of their duty, spanning more than three hundred years from the 1647 statutory mandate that youths be instructed "so far as they may be fitted for the University," to more recently recommended standards and practices such as the State Department of Education's 1958 report on *Minimum Standards and Recommended Practices for New Hampshire Secondary Schools*. The Encouragement of Literature clause expressly recognizes that a free government is dependent for its survival on citizens who are able to participate intelligently in the political, economic, and social functions of our system. The duty placed on the State encompasses cherishing the public schools. The constitution also provides that the legislature and the Governor have a duty to encourage "the promotion of agriculture, arts, sciences, commerce, trades, [and] manufacturers" and inculcate "the principles of humanity and general benevolence, public and private charity, industry and economy, honesty and punctuality, sincerity, sobriety, and all social affections, and generous sentiments, among the people." N.H. CONST. pt. II, art. 83. The education necessary to meet the duty to cherish public schools must, of course, "be adapted to the various crises of human affairs." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819) (emphasis omitted).

Given the complexities of our society today, the State's constitutional duty extends beyond mere reading, writing and arithmetic. It also includes broad educational opportunities needed in today's society to prepare citizens for their role as participants and as potential competitors in today's marketplace of ideas. *Cf. Seattle Sch. Dist.*

*No. 1 of King Cty. v. State*, 90 Wash. 2d 476, 585 P.2d 71 (1978). We are confident that the legislature and the Governor will fulfill their responsibility with respect to defining the specifics of, and the appropriate means to provide through public education, the knowledge and learning essential to the preservation of a free government.

We remand the plaintiffs' petition for further proceedings consistent with this opinion.

*Reversed and remanded.*

THAYER, J. did not sit; GRIMES, C.J., retired, sat by special assignment under RSA 490:3; all concurred.