Merrimack
No. 98-695

### DAVID J. FISCHER

v.

### GOVERNOR & a.

March 24, 2000

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief and orally), for the plaintiff.

*Philip T. McLaughlin*, attorney general (*Martin P. Honigberg*, senior assistant attorney general, and *Mary E. Schwarzer*, attorney, on the brief, and *Mr. Honigberg* orally), for the State.

*Michael, Jones & Wensley*, of Rochester, for the defendants, the City of Rochester and the Rochester Board of Supervisors of the Checklist, filed no brief.

*Marc Mauer*, of Washington, D.C., by brief, for The Sentencing Project, as *amicus curiae*.

*Gillian E. Metzger & a.*, of New York, New York, by brief, for Brennan Center for Justice at New York University School of Law, as *amicus curiae*.

*Emily Bolton*, of New Orleans, Louisiana, by brief, as *amicus curiae*.

BRODERICK, J. The State appeals a ruling of the Superior Court (*Brennan*, J.) that the felon disenfranchisement statutes, RSA 607-A:2 (1986) and RSA 654:5 (1996), violate Part I, Article 11 of the New Hampshire Constitution. It argues that the legislature has constitutional authority under Article 11 to determine voter qualifications and that the legislature reasonably excluded incarcerated felons from the franchise. Alternatively, it argues that if no such authority exists under Article 11, the legislature had compelling reasons to deprive incarcerated felons of their right to vote. The State also asserts that the trial court did not have the proper parties before it. We reverse.

I

The plaintiff, David J. Fischer, is incarcerated at the New Hampshire State Prison on two felony convictions, attempted first

degree assault and witness tampering. In September 1998, he requested that the Rochester city clerk register him to vote in the next election and send him an absentee ballot. In response, the city clerk sent him a copy of RSA 607-A:2, which prohibits a felon from voting "from the time of his sentence until his final discharge."

The plaintiff brought a petition for declaratory judgment and injunctive relief against the defendants, the Governor, the Secretary of State, and the Supervisor of the Checklist of the City of Rochester. He alleged that the disenfranchisement statutes violate his right to vote under Part I, Article 11 of the New Hampshire Constitution. The trial court agreed and declared the disenfranchisement statutes unconstitutional. It ordered local election officials to allow the plaintiff and others similarly situated to register and vote in the next election. This appeal followed.

## II

■ We briefly address the State's argument that the trial court did not have the proper parties before it to decide the plaintiff's case and that its decision should be vacated. The State argues that neither the Governor nor the Secretary of State had the authority to remove or add a name to the voting checklist, and that the local supervisors of the checklist are the only proper parties to this action under RSA 654:42 (1996). The State acknowledges that one checklist supervisor was named as a defendant but asserts that she was never properly served with process. The named supervisor, however, did not object to service irregularities. She submitted herself to the court's jurisdiction by filing a motion to dismiss, arguing that she had no independent authority to change the checklist. *See Lachapelle v. Town of Goffstown*, 134 N.H. 478, 480, 593 A.2d 1152, 1153 (1991); *Dolber v. Young*, 81 N.H. 157, 159, 123 A. 218, 219 (1923). The trial court denied her motion and joined the remaining local supervisors as defendants. Those rulings were not appealed. Because the trial court had proper parties before it, it possessed the authority to decide the matter at issue. We need not decide, therefore, whether the Governor and Secretary of State were appropriate parties.

## III

Having determined that the trial court had the authority to decide this case, we turn directly to its central issue: whether the felon disenfranchisement statutes violate Part I, Article 11 of the State Constitution. After a review of Article 11, its constitutional history,

and legislation pertinent to the historical right of felons to vote, we conclude that the legislature retains the authority under Article 11 to determine voter qualifications and that the felon disenfranchisement statutes are a reasonable exercise of legislative authority.

The State argues that from its inception, Article 11 has always provided the legislature with the authority to determine voter qualifications. Although acknowledging that Article 11 has been amended over the years to remove certain qualifications from the legislature's purview, the State asserts that the legislature's underlying constitutional authority to identify qualified voters has never been altered. The plaintiff contends that Article 11 as presently crafted is plain on its face and grants the right to vote to all inhabitants who are at least eighteen years old, excepting only persons convicted of three enumerated offenses: treason, bribery, and willful violation of State or federal election laws. He acknowledges that the legislature previously had the power under Article 11 to determine voter qualifications, but asserts that a 1974 constitutional amendment removed that authority from Article 11. We begin our review with the language of the constitution itself. *See N.H. Munic. Workers' Comp. Fund v. Flynn, Comm'r*, 133 N.H. 17, 21, 573 A.2d 439, 441 (1990).

Part I, Article 11 in its present form states:

All elections are to be free, and every inhabitant of the state of 18 years of age and upwards shall have an equal right to vote in any election. Every person shall be considered an inhabitant for the purposes of voting in the town, ward, or unincorporated place where he has his domicile. No person shall have the right to vote under the constitution of this state who has been convicted of treason, bribery or any willful violation of the election laws of this state or of the United States; but the supreme court may, on notice to the attorney general, restore the privilege to vote to any person who may have forfeited it by conviction of such offenses. The general court shall provide by law for voting by qualified voters who at the time of the biennial or state elections, or of the primary elections therefor, or of city elections, or of town elections by official ballot, are absent from the city or town of which they are inhabitants, or who by reason of physical disability are unable to vote in person, in the choice of any officer or officers to be elected or upon any question submitted at such election. Voting registration and polling places shall be easily accessible to all persons

including disabled and elderly persons who are otherwise qualified to vote in the choice of any officer or officers to be elected or upon any question submitted at such election. The right to vote shall not be denied to any person because of the nonpayment of any tax. Every inhabitant of the state, having the proper qualifications, has an equal right to be elected into office.

N.H. CONST. pt. I, art. 11. By the article's plain language, an individual must satisfy several criteria to be allowed to vote. An individual must be an inhabitant of this State, at least eighteen years of age, and without prior conviction for treason, bribery, or willful violation of the State or federal election laws. Finally, any individual in need of an absentee ballot must be a "qualified voter[]" in order to vote. It is not disputed that the plaintiff meets all of the criteria but the last. The definition of "qualified voters" in the absentee ballot provision, however, is not clear on the face of the article. "[Q]ualified voters" may encompass only those qualifications enumerated within Article 11 itself; namely, age, inhabitancy, and lack of prior convictions. Alternatively, because the term falls within a constitutional directive to the legislature to enact absentee voter legislation, "qualified voters" may vest the legislature with authority to define the qualifications for absentee voters, a class which includes incarcerated felons. To determine the intended parameters of "qualified voters," therefore, we look behind the language of Article 11 to examine its relevant historical development. *See Claremont School Dist. v. Governor,* 138 N.H. 183, 186-88, 635 A.2d 1375, 1377-79 (1993).

At its inception in 1784, Article 11 provided:

All elections ought to be free, and every inhabitant of the State, having the proper qualifications, has equal right to elect and be elected into office.

N.H. CONST. pt. I, art. 11, *reprinted in* THE NEW HAMPSHIRE MANUAL OF USEFUL INFORMATION 42 (1889). The language of the article was broad, granting the right to vote and to be elected to all inhabitants of New Hampshire with "proper qualifications." Because "proper qualifications" was defined neither in Article 11 nor in the constitution itself, the legislature necessarily had the constitutional authority to define its scope. *See State v. Sullivan,* 101 N.H. 429, 430, 146 A.2d 1, 2-3 (1958) (although right to vote is constitutionally protected under Part I, Article 11, it is subject to reasonable regulation by legislature).

In 1789, exercising its authority under Article 11, the legislature circumscribed the right to vote by limiting the franchise to male taxpayers who were at least twenty-one years of age. Laws 1789, ch. 64. Decades later, the legislature further restricted the franchise to native or naturalized citizens of the United States and revoked the right to vote for "paupers and persons excused from paying taxes at their own request." Laws 1830, tit. XCVI § 1; RS 24:1 (1843); CS 25:1 (1853); GS 27:1 (1867); PS 31:1 (1891). In 1837, the legislature enacted a civil death statute, which equated conviction for a narrow category of crimes with "civil death," declaring all rights of the convicted curtailed in the same manner as by natural death. Laws 1837, 273:4. The legislature originally extended civil death only to persons sentenced to "solitary imprisonment and confinement to hard labor for life." *Id.* After briefly expanding this class to persons sentenced to "imprisonment or confinement to hard labor for life," RS 225:14 (1843); CS 240:17 (1853), the legislature ultimately restricted civil death to apply only to those sentenced to die, GS 244:7 (1867); GL 262:7 (1878); PS 255:8 (1891); PL 369:8 (1926); RL 429:8 (1942); RSA 607:8 (1955) (repealed 1967). All criminals subject to civil death were necessarily barred from voting. Therefore, during much of the nineteenth century, only women, paupers, persons excused from paying taxes at their own request, and criminals subject to civil death were statutorily barred from voting.

The category of persons subject to disenfranchisement expanded in 1912 when the constitutional convention voted to amend Article 11 to revoke the voting rights of all persons convicted of certain enumerated offenses (conviction provision), CONVENTION TO REVISE THE CONSTITUTION 409 (1912), and the citizens subsequently ratified the amendment, MANUAL FOR THE GENERAL COURT 281-83 (1913). As a result, Article 11 provided:

> All elections ought to be free; and every inhabitant of the state, *having the proper qualifications*, has equal right to elect and be elected into office; but no person shall have the right to vote, or be eligible to office under the constitution of this state, who shall not be able to read the constitution in the English language, and to write, provided however, that this provision shall not apply to any person prevented by a physical disability from complying with its requisitions, nor to any person who now has the right to vote, nor to any person who shall be sixty years of age or upwards on the first day of January, A. D. 1904, and provided further, that *no person shall have the right to vote, or be eligible to*

> *office under the constitution of this state who shall have been convicted of treason, bribery, or any wilful violation of the election laws of this state or of the United States; but the Supreme Court may, on notice to the attorney-general restore the privileges of an elector to any person who may have forfeited them by conviction of such offenses.*

N.H. CONST. pt. I, art. 11, reprinted in MANUAL FOR THE GENERAL COURT 422 (1913) (emphasis omitted and added).

█ When initially proposed, the conviction provision included "felony" and "larceny" within its list of disenfranchising offenses. CONVENTION TO REVISE THE CONSTITUTION 110-11 (1912). Ultimately, both categories were eliminated from the amendment in order "to strike out all offenses not relating to elections, with the exception of treason." *Id.* at 409-10. The "proper qualifications" language, however, remained unchanged, and thus the legislature retained its authority to determine who was qualified to vote beyond the criteria enumerated in Article 11. Indeed, removal of "felony" from the proposed list of disenfranchising offenses demonstrates the convention's intent to permit the legislature to continue to determine under the "proper qualifications" provision whether felons should be prevented from voting. To interpret the convention's intent differently would implicitly repeal the legislature's authority under "proper qualifications" to decide whether felons should forfeit the right to vote based solely on the unsuccessful insertion of a disqualification into the constitution. This we decline to do. Accordingly, we conclude that while the conviction provision inserted into Article 11 in 1912 prohibited the legislature from extending the franchise to those convicted of its three enumerated offenses, it did not undermine the legislature's authority under "proper qualifications" to disenfranchise those convicted of other crimes, whether or not they were incarcerated.

While there was neither a constitutional nor a legislative impediment to felons' right to vote when the conviction provision was adopted in 1912, incarcerated felons were effectively denied their franchise until 1925 when the legislature first enacted absentee voting legislation. Laws 1925, ch. 20. Without such legislation, incarcerated felons had no means under the law of casting their ballots on election day. Therefore, with the advent of absentee voting, incarcerated felons had the ability to vote for the first time.

█ In 1942, Article 11 was amended to include an absentee ballot provision expressly authorizing the legislature to devise absentee

voting legislation, presumably ratifying the legislature's enactment of the 1925 legislation. CONVENTION TO REVISE THE CONSTITUTION 94 (1941); N.H. CONST. pt. 1, art. 11, *reprinted in* RSA vol. 1 (1955). As amended, Article 11 provided:

> All elections ought to be free, and every inhabitant of the state, having the *proper qualifications*, has equal right to elect, and be elected, into office; but no person shall have the right to vote or be eligible to office under the constitution of this state who shall not be able to read the constitution in the English language and to write; provided, however, that this provision shall not apply to any person prevented by a physical disability from complying with its requisitions, nor to any person who now has the right to vote, nor to any person who shall be sixty years of age or upwards on the first day of January, A. D. 1904; and provided further that no person shall have the right to vote, or be eligible to office under the constitution of this state who shall have been convicted of treason, bribery, or any wilful violation of the election laws of this state, or of the United States; but the supreme court may, on notice to the attorney-general restore the privileges of an elector to any person who may have forfeited them by conviction of such offences. *The general court shall have power to provide by law for voting by qualified voters who at the time of biennial or state elections or of city elections are absent from the city or town of which they are inhabitants, or who by reason of physical disability are unable to vote in person, in the choice of any officer or officers to be elected or upon any questions submitted at such election.*

N.H. CONST. pt. 1, art. 11, *reprinted in* RSA vol. 1 (1955) (emphasis added and omitted). Because the "proper qualifications" language remained unchanged, the legislature retained the authority to define voter qualifications beyond those articulated in Article 11 itself. Thus, the term "qualified voters" in the absentee ballot provision embodied qualifications enumerated within Article 11 as well as those enacted by the legislature pursuant to its general authority to determine "proper qualifications" of voters.

█ In 1967, the legislature enacted the first of the felon disenfranchisement statutes at issue, RSA 607-A:2. The statute provides in pertinent part:

I. A person sentenced for a felony, from the time of his sentence until his final discharge, may not:

(a) Vote in an election, but if execution of sentence is suspended with or without the defendant being placed on probation or he is paroled after commitment to imprisonment, he may vote during the period of the suspension or parole.

RSA 607-A:2; *see also* Laws 1979, 436:1 (codified at RSA 654:5) ("A person sentenced for a felony shall forfeit his rights as provided in RSA 607-A:2."). The legislative history of RSA chapter 607-A reveals its design:

[The proposed bill] concerns a person who is convicted of a felony — convicted and confined in State Prison and who would not be able to become a candidate for public office or vote. As it is now, such a person can do these things.

N.H.S. JOUR. 452 (1967). In 1967, Article 11 still included the "proper qualifications" language for both voting and candidacy. *See* N.H. CONST. pt. I, art. 11, *reprinted in* RSA vol. 1 (Supp. 1967). Therefore, the legislature had the constitutional authority to suspend the voting rights of incarcerated felons provided such restriction was reasonable. *Cf. Paey v. Rodrigue,* 119 N.H. 186, 189, 400 A.2d 51, 53 (1979) (legislature had the authority to establish "proper qualifications" for candidates); *Sullivan,* 101 N.H. at 430, 146 A.2d at 2-3 (although right to vote is constitutionally protected under Part I, Article 11, it is subject to reasonable regulation by legislature).

In 1974, the constitutional convention voted to further amend Article 11 to effect numerous substantive and structural changes, CONVENTION TO REVISE THE CONSTITUTION 521-22 (1974), and the citizens subsequently ratified the amendment, MANUAL FOR THE GENERAL COURT 688-89 (1977). The journal of the 1974 constitutional convention defines the intended scope of the amendment as (1) reducing the minimum age of voters to eighteen, (2) incorporating domicile rather than residence as a prerequisite for the voting privilege, (3) requiring that the secretary of state receive and count votes and notify winners of biennial elections, (4) mandating the availability of absentee ballots, and (5) "simplif[ying] the present wording of the Constitution." CONVENTION TO REVISE THE CONSTITUTION 177 (1974). The amendment, once ratified, incorporated the proposed substantive changes. It also severed the voting and candidacy clauses and placed them in separate sentences.

The "proper qualifications" language, which prior to the amendment modified both voting and candidacy rights, was removed from the voting provision and retained solely in the sentence granting every inhabitant an equal right to run for elected office. Thus, the first sentence of Article 11 provides in part: "All elections are to be free, and every inhabitant of the state of 18 years of age and upwards shall have an equal right to vote in any election;" and the last states: "Every inhabitant of the state, having the proper qualifications, has an equal right to be elected into office." N.H. CONST. pt. I, art. 11.

Rearranging the voting and candidacy provisions and removing "proper qualifications" from the former substantively changed the constitution. Removal of the phrase "proper qualifications" from the voting provision eliminated the historic authority of the legislature to define voter qualifications beyond those enumerated in Article 11. A fair reading of Article 11 in its present form would not support allowing the legislature to define voter qualifications. It is clear, however, that the removal of the "proper qualifications" language from the voting provision did not conform to the scope of the amendment intended by the constitutional convention. Specifically, it did not relate to the four intended substantive changes regarding age, domicile, duties of the secretary of state, and absentee voting, and far exceeded the convention's remaining intent to "simplify" the wording of Article 11. Indeed, as noted by the State, the ballot questionnaire submitted to the citizens for ratification of the 1974 amendment failed to alert the voters to any substantive change to the legislature's authority to generally determine voter qualifications. Thus, we must decide whether the voters effectively adopted the amendment to Article 11 that eradicated this legislative authority.

We adhere to the precept that "every reasonable presumption, both of law and fact, is to be indulged in favor of the validity of an amendment to the Constitution when it is attacked after its ratification by the people." *Concrete Co. v. Rheaume Builders*, 101 N.H. 59, 61, 132 A.2d 133, 135 (1957) (quotation omitted). We should not declare unconstitutional the voters' ratification of the amendment at issue absent "inescapable grounds." *Opinion of the Justices*, 101 N.H. 541, 543, 133 A.2d 790, 792 (1957) (quotation omitted). Further, while "the question submitted to the electorate need not inform it of the details nor full import of the proposed amendment," it must give "the ordinary person a clear idea of what he [or she] is voting for or against." *Id.* at 61, 132 A.2d at 135. With this standard in mind, we turn to the ballot question presented to the voters for their ratification of the 1974 amendment.

Certain questions proposed by the 1974 constitutional convention were presented to the electorate in 1976. Question eight inquired:

Are you in favor of amending the Constitution to make the following changes relating to elections:

(a) to reduce the minimum age of voters to eighteen;

(b) to make domicile rather than being an inhabitant a prerequisite for the voting privilege;

(c) to repeal certain provisions relative to voting in unincorporated places;

(d) to specify that the receipt and counting of ballots and notification of winners in biennial election contests will be handled by the secretary of state; and

(e) to provide the right to vote by absentee ballot in biennial or state elections, or in the primary elections therefor, or in city elections or town elections by official ballot?

MANUAL FOR THE GENERAL COURT 688 (1977). None of these subparts alerted voters to a dilution or elimination of the legislature's general authority to determine voter qualifications, an indisputably significant and substantial change to the historical and constitutional parameters of Article 11. Similarly, the "Voters' Guide" distributed to the electorate in advance of the ballot question did not illuminate any substantive change to the legislature's authority to determine voter qualifications generally. *See Concrete Co.*, 101 N.H. at 60, 132 A.2d at 135 ("Voters' Guide," as a circumstance surrounding voter ratification of constitutional amendment, is properly considered to determine purpose and effect of proposed amendment). Therefore, embracing removal of "proper qualifications" from the voting provision on the record before us would effectively "*add to the proposition upon which the voters acted,*" *id.* at 61, 132 A.2d at 136, and thereby abolish the longstanding and well-established authority of the legislature to define voter qualifications.

We conclude that the record manifests "inescapable grounds" that the voters were never given notice that the 1974 amendment changed or modified the legislature's authority to determine voter qualifications generally, much less completely eradicate it. *See Opinion of the Justices*, 101 N.H. at 543, 133 A.2d at 792. Thus, Part I, Article 11 was not properly amended to cause the removal of

"proper qualifications" from the voting clause. Because it is evident that this change was neither "dependent upon nor interwoven with" the other changes to Article 11 nor with the amendments to additional articles simultaneously ratified by the electorate, all other changes to Article 11 and the remaining amendments are unaffected by our holding. *Gerber v. King*, 107 N.H. 495, 500, 225 A.2d 620, 623 (1967) (quotation omitted).

█ Because we conclude that the 1974 amendment failed to remove the legislature's authority to generally define "proper qualifications" of voters, the "qualified voters" language within the absentee voting provision, of necessity, embodies the qualifications enumerated in Article 11 itself as well as those created by the legislature, which include the qualifications required by the felon disenfranchisement statutes. Thus, if the legislature properly exercised its authority under "proper qualifications" to suspend the right to vote for incarcerated felons, it follows that the plaintiff is not a "qualified" absentee voter under the absentee ballot provision.

In deciding whether the legislature properly exercised its authority under Article 11 when enacting the felon disenfranchisement statutes, we measure the constitutionality of its actions under a reasonableness standard. *See Paey*, 119 N.H. at 189, 400 A.2d at 53 ("proper qualifications" of elected office established by legislature pursuant to Article 11 must be reasonable); *Opinion of the Justices*, 83 N.H. 589, 592, 139 A. 180, 182 (1927) (rights to elect and be elected are equal); *see also Sullivan*, 101 N.H. at 430, 146 A.2d at 2-3 (although right to vote is constitutionally protected under Part I, Article 11, it is subject to reasonable regulation by legislature). The State maintains that it has an interest in limiting the franchise to voters who have not violated "the social contract that forms the foundation of [a] representative democracy."

█ We cannot say that it is unreasonable for the legislature to conclude that a citizen who commits a felony and is incarcerated also abandons the right to participate in voting for those who create and enforce the laws; namely, persons serving in the legislative and executive branches of government. *Cf. Green v. Board of Elections of City of New York*, 380 F.2d 445, 451-52 (2d Cir. 1967) (decided under equal protection analysis). In addition, it is not unreasonable for the legislature to disenfranchise incarcerated felons, while allowing incarcerated misdemeanants to retain the right to vote. The legislature, in its wisdom, decided to disenfranchise only those criminals convicted of the most serious offenses for the duration of

their incarceration. Accordingly, the felon disenfranchisement statutes do not violate Article 11.

## IV

■ The plaintiff's remaining arguments demand only our brief attention. The plaintiff argues that other provisions within our State Constitution establish his right to vote. Specifically, the plaintiff likens the language in Part I, Articles 1 and 2 of the State Constitution that "[a]ll men are born equally free and independent" and "[a]ll men have certain natural, essential, and inherent rights" to purportedly similar language in the Massachusetts Constitution in which the high court of that State determined that prisoners have a constitutionally protected right to vote. *See Dane v. Board of Registrars, Etc.*, 371 N.E.2d 1358, 1364 (Mass. 1978). Even if we assume these general provisions incorporate the right to vote, they must be read consistently with Article 11, the specific voting provision within our constitution. *Cf. State v. Bell*, 125 N.H. 425, 432, 480 A.2d 906, 911 (1984) (specific, more detailed statute viewed as exception to general statute where two conflict). Accordingly, the legislature's constitutional authority to enumerate voter qualifications cannot be inhibited by the general language of Part I, Articles 1 and 2.

■ Next, the plaintiff argues that the disenfranchisement statutes violate his right to an absentee ballot. We observe that the plaintiff's articulation of his specific constitutional challenge lacks clarity. Thus, we review the one argument that we can discern he advances; namely, his inability to exercise his right to vote by means of absentee ballot violates equal protection and "the right to vote itself." Because he does not articulate his reliance on either the State or Federal Constitution, fails to cite a provision of the New Hampshire Constitution, and cites federal cases to support his claim, we limit our review to the Federal Constitution. *State v. Martin*, 138 N.H. 508, 512-13, 643 A.2d 946, 948-49 (1994). Moreover, no State equal protection argument was effectively advanced before the trial court. Thus, even if it had been articulated on appeal, it would not have been preserved. We need not pause long on the plaintiff's federal constitutional claim because, as he concedes in his brief, "[i]t is undisputed that the statutes do not violate any federal rights." *See Richardson v. Ramirez*, 418 U.S. 24, 56 (1974).

Finally, we do not address the plaintiff's remaining arguments because either the record before us does not demonstrate that they were argued before the trial court, and thus we deem them waived,

*Quirk v. Town of New Boston*, 140 N.H. 124, 128, 663 A.2d 1328, 1331 (1995), or they lack merit and warrant no further discussion, *Vogel v. Vogel*, 137 N.H. 321, 322, 627 A.2d 595, 596 (1993).

*Reversed.*

THAYER, J., sat but, on administrative leave, did not participate; NADEAU, J., did not sit, the others concurred.