Philip–Anthony BONNER, a minor, by his parents and next friends, Joseph and LaTanya BONNER, William–Thomas Bobo, a minor, by his mother and next friend, Clarissa Wan Bobo, John Brooks, Jr., a minor, by his father and next friend, John Brooks, Sr., Aaron Wesley Carver, a minor, by his parents and next friends, Lester and Vanessa Carver, Thomas James Harris, a minor, by his mother and next friend, Patricia Harris, Demi Murry, a minor, by her grandparents and next friends, Patricia and Charles Murry, Dameesha Fletcher, a minor, by her mother and next friend, Loretta Fletcher, Brendan Johnson, a minor, by his mother and next friend, Ayana Johnson, and Albert Serna, a minor, by his parents and next friends, Berth and Cirilo Serna, On Behalf of Themselves and All Others Similarly Situated, Appellants–Plaintiffs,

v.

Mitch DANIELS, Governor of the State of Indiana and Co–Chair of the Education Roundtable, Suellen K. Reed, Indiana State Superintendent of Public Instruction and Chair of the State Board of Education and Co–Chair of the Education Roundtable, and the Indiana State Board Of Education, Appellees–Defendants.

No. 49A02–0702–CV–188.

Court of Appeals of Indiana.

May 2, 2008.

Ronald J. Waicukauski, Jana K. Strain, Price Waicukauski & Riley, LLC, Indianapolis, IN, Michael D. Weisman, Rebecca P. McIntyre, Weisman & McIntyre Boston, MA, Attorneys for Appellants.

Jerry Garau, Findling Garau Germano & Pennington, P.C., Indianapolis, IN, Molly A. Hunter, New York, NY, Ellen Boylan, Newark, NJ, Amanda G. Adler, Columbia, SC, Attorneys for AMICI Curiae in Support of Appellants.

Steve Carter, Attorney General of Indiana, Thomas M. Fisher, Solicitor General, Julie A. Brubaker, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellees.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellants–Plaintiffs, Philip–Anthony Bonner, a minor, by his parents and next friends, Joseph and LaTanya Bonner, *et al.*, On Behalf of Themselves and All Others Similarly Situated (collectively, Bonner), appeal the trial court's Order to Dismiss entered in favor of Appellees–Defendants, Mitch Daniels, Governor of the State of Indiana and Co–Chair of the Education Roundtable (Governor Daniels),

Suellen K. Reed, Indiana State Superintendent of Public Education and Co–Chair of the Education Roundtable (Dr. Reed), and the Indiana State Board of Education (Board of Education) (collectively, Appellees).[1]

We reverse and remand for further proceedings.

## ISSUES

Bonner raises four issues on appeal, two of which we find dispositive [2] and which we restate as follows:

(1) Whether the trial court erred in dismissing Bonner's cause finding that the justiciability standard precluded judicial review; and

(2) Whether the trial court erred in finding that the Education Clause, encapsulated in Article VIII, § 1 of the Indiana Constitution, does not provide judicially enforceable guidelines.

## FACTS AND PROCEDURAL HISTORY

This is a class action suit, spear-headed by nine students who attend public schools within the jurisdiction of eight different school corporations.[3] Bonner seeks to represent a class of children similarly situated either because (1) they attend, or will attend, public school in the same school corporations; or (2) on account of their poverty, their race or ethnicity, their physical or mental disabilities, or their limited English proficiency, they are not receiving an education that equips them with the knowledge and skills they need to compete for productive employment, to pursue higher education, and to become responsible and informed citizens. The suit alleges that significant numbers of students in this class are failing to meet State academic standards and are not acquiring the minimum knowledge and skills mandated by the Education Clause of the Indiana Constitution. As a result, the cause maintains, this class is being denied skills that are essential to successful and productive citizenship.

The Board of Education has adopted academic standards for each grade level from kindergarten through grade twelve for English language, arts, mathematics, social studies, and science. These standards define the knowledge every public school student should possess at each grade level to succeed in school. Additionally, the Board of Education has adopted Standards for Technological Literacy, which define a student's expected ability to use, manage, assess, and understand current technology.

In order to evaluate a student's progress towards achieving these academic standards, Indiana uses various indicators which also serve to hold schools and school

---

1. Oral argument was held in the Indiana Supreme Court Courtroom on December 12, 2007. We thank counsel for their excellent advocacy.

2. Because we find these two issues dispositive, we will not discuss Bonner's two additional claims: (1) whether the trial court erred in dismissing Bonner's claim pursuant to the Equal Privileges and Immunities Clause, Ind. Const. Art. I, § 23 and (2) whether the trial court erred in dismissing Bonner's claim pursuant to the Due Course of Law Clause, Ind. Const. Art. I, § 12.

3. These school corporations are the Indianapolis Public Schools, the Metropolitan School District of Perry Township, the Metropolitan School District of Washington Township, the Metropolitan School District of Lawrence Township, the Metropolitan School District of Decatur Township, the Anderson Community School Corporation, the South Bend Community School Corporation, and the School City of Hammond.

corporations accountable for providing their students with the education mandated by the State constitution. The reported indicators include performance on the Indiana State Test of Educational Progress (ISTEP+), graduation and dropout rates, SAT scores and participation rates, and the percentage of graduates pursuing higher education. The Complaint describes the data collected by the Department of Education on the various indicators for the eight school districts involved and for the State as a whole. This data appears to reveal that numerous students in the affected class are failing to meet state academic standards and are failing to acquire the minimum skills needed to lead successful lives. According to Bonner, one contributing factor to this low achievement is Indiana's failure to make available high-quality instructional programs, such as early childhood education, appropriately small class sizes, summer school, remediation programs, supplemental reading instruction programs, and English language instruction programs.

Bonner's overarching claim revolves around Indiana's school-funding formula, alleging that Indiana's school finance system is arbitrary and, as a result, fails to meet the State's educational goals and the needs of the State's public school children. Since 1949, Indiana has relied on a Foundation Program to provide revenues for education to public school corporations. The Foundation Program is a series of interrelated formulas that determine the revenue school corporations should receive for providing basic educational services to their students and the division of funding between the State and local government. Under the Foundation Program, a school corporation's Foundation Grant is determined, in part, by the Average Daily Membership and the Complexity Index. The Average Daily Membership of each school corporation apportions money based on the number of students attending each school corporation, while the Complexity Index purports to reflect the socioeconomic status of the corporation's community. The theory of the Foundation Grant, with its Complexity Index, is that school corporations serving more at-risk student populations require more dollars to obtain the same level of student performance compared to school corporations serving less complex student populations.

Besides the Foundation Program, a school corporation might choose to calculate its basic tuition support by the Guaranteed Minimum Revenue. The Guaranteed Minimum Revenue ensures that every school corporation receives at least ninety-nine percent of the previous year's basic tuition support. Thus, each school has the choice to receive the greater of the Foundation Grant or the Guaranteed Minimum Revenue.

From 2000 through 2005, there was a significant decrease in the number of school corporations receiving revenue through the Complexity Index of the Foundation Grant. Specifically, in 2004 and 2005, less than fifteen percent of all school corporations received funding through the Foundation Grant, thereby rendering the Complexity Index, intended to benefit disadvantaged students, increasingly irrelevant in determining revenues.

Furthermore, school corporations do not receive any revenue from the State for debt service, capital projects, or special education preschool programs. They receive only a limited property tax replacement credit for school transportation and school bus replacement costs. Under the current financing system, school corporations must rely solely on their ability to levy and collect property taxes for these purposes, as well as for funding new school facilities, improvements or renovations in

existing school facilities, and improvements to technology. As school corporations are completely dependent on local property wealth to fund new capital projects, there is a wide variation in the quality and quantity of school facilities across the State.

On April 20, 2006, Bonner filed a Class Action Complaint seeking a declaration of rights pursuant to Ind.Code § 34–14–1–1 *et seq.* that (1) the Indiana Constitution imposes an enforceable duty on the General Assembly to provide a quality public education that prepares all of Indiana's children to function in a complex and rapidly changing society, to discharge the duties and responsibilities of citizenship, and to compete successfully with their peers for productive employment and opportunities for advancement through higher education; and (2) Indiana's current system of financing violates the Indiana Constitution, with the result that the class of affected students are not receiving their constitutional right to education. On July 13, 2006, Appellees filed a Motion to Dismiss in accordance with Ind. Trial Rule 12(B)(1) and (6), arguing that (1) because the school corporations' funding program is a quintessential legislative policy decision, the courts, pursuant to the separation of powers doctrine, are precluded from adjudicating Bonner's claim, and (2) even if the claims were justiciable, Appellees, as named defendants, could not provide the relief sought. On September 29, 2006, Bonner filed his Opposition to [Appellees'] Motion to Dismiss. On November 6 and December 18, 2006, respectively, the parties filed a Reply Brief and a Sur–Reply Brief.

On January 29, 2007, following a hearing, the trial court issued an Order, granting Appellees' Motion to Dismiss. In its Order, the trial court provided, in pertinent part, as follows:

Standing and Proper Parties

. . .

[Bonner] ha[s] a substantial interest in the relief sought and ha[s] private standing. Parents and children have found to have standing when challenging governmental actions as contrary to the Education Clause . . . .

[Appellees] argue in part this matter should be dismissed because they cannot provide any meaningful relief to [Bonner]. [Bonner] must demonstrate that the unlawful conduct complained of is fairly traceable to the [Appellees] and likely to be redressed by the relief sought. The duty imposed in the Education Clause is upon the General Assembly, not the named [Appellees] in this case. The General Assembly with its constitutional mandate may delegate to state agencies and executive branch officials the authority to make major policy decisions in the form of rules and regulations. When a state agency makes major policy decisions under a grant of authority from the legislature, those policy decisions are deemed to be those of the General Assembly.

The declaratory relief sought by [Bonner] seeks to void the current public school funding formula used in the State of Indiana. The facts alleged and law demonstrates the General Assembly had delegated in part, the function of carrying out calculating this school funding formula to [the Board of Education]. In contrast, the facts and law alleged do not demonstrate such a delegation to the other named [Appellees]. Accordingly, this [c]ourt hereby GRANTS [Appellees'] Motion to Dismiss as to [Governor Daniels] and [Dr. Reed].

[Appellees] cite *Sendak v. Allen,* 164 Ind.App. 589, 330 N.E.2d 333 (Ind.Ct. App.1975) and other cases for the proposition that the [Board of Education]

should be dismissed for [Bonner's] failure to name individual board members as defendants. While the cases cited by the [Appellees] suggest the State of Indiana may not be sued in its sovereignty, these cases do not appear to preclude bringing suit against a governmental organization such as the [Board of Education]. In addition, the clear language of Indiana Trial Rule 19(F)(1) directs claims against governmental organizations be brought by naming the governmental organization.

### Standing and Redressability

. . .

Upon this premise [Bonner's] [c]omplaint must fail. The [c]omplaint alleges a constitutional failure of the school funding formula as a basis for relief. A closer examination of [Bonner's] claim seems to be in reality, dissatisfaction with how the formula is weighed and implemented by the [Board of Education], not the formula itself. This examination coupled with the [c]ourt's duty to maintain and recognize the separation of powers doctrine leads to the conclusion that redressability is speculative in this case. Accordingly, the [c]ourt now GRANTS [Appellees'] Motion to Dismiss as to the remaining defendants.

(Appellants' App. pp. 14–15) (some internal citations omitted).

Bonner now appeals. Additional facts will be provided as necessary.

### DISCUSSION AND DECISION

Bonner presents us with a case of first impression. Although most other states have already determined the issues presented for our review, never before has an Indiana court been requested to answer Bonner's questions. The vast majority of courts in our sister states have concluded that this cause is justiciable and that state constitutions impose enforceable duties on the legislative and executive branch to provide a quality education to public school students.

### I. *Standard of Review*

 This matter comes before us as an appeal of the trial court's grant of Appellees' Motion to Dismiss Bonner's request for declaratory judgment. A motion to dismiss for failure to state a claim tests the legal sufficiency of the claim, not the facts supporting it. *Charter One Mortg. Corp. v. Condra*, 865 N.E.2d 602, 605 (Ind. 2007). Thus, our review of a trial court's grant or denial of a motion based on Indiana Trial Rule 12(B)(6) is *de novo. Id.* When reviewing a motion to dismiss, we view the pleadings in the light most favorable to the non-moving party, with every reasonable inference construed in the nonmovant's favor. *Id.* A complaint may not be dismissed for failure to state a claim upon which relief can be granted unless it is clear on the face of the complaint that the complaining party is not entitled to relief. *Id.* Consequently, all allegations in the complaint must be accepted as true, and it is the appellate court's duty to determine whether the underlying complaint states "any set of allegations upon which the court below could have granted relief." *Watson v. Auto Advisors, Inc.*, 822 N.E.2d 1017, 1023 (Ind.Ct.App.2005), *trans. denied.* Dismissal of a complaint under T.R. 12(B)(6) is disfavored generally because such motions undermine the policy of deciding causes of action on their merits. *Crosson v. Berry*, 829 N.E.2d 184, 189 (Ind.Ct.App.2005), *trans. denied.* Additionally, we are mindful that in reviewing a motion to dismiss in an action for declaratory relief, we need to take into account the purpose and objectives underlying declaratory judgment actions and the litigatory posture of the dispute. *Volkswagen-*

*werk, A.G. v. Watson,* 181 Ind.App. 155, 390 N.E.2d 1082, 1084 (1979).

## II. *Separation of Powers Doctrine & Justiciability*

First, Bonner disputes the trial court's dismissal of his cause based on the separation of powers doctrine and the trial court's conclusion that any injury is not likely to be redressed by the relief sought. The parties' respective arguments revolve around three main topics: (1) standing, (2) redressability of any injury, and (3) whether relief was sought from the proper defendants.

### A. *Standing*

At the outset, Bonner contends that the Declaratory Judgment Act, I.C. § 34–14–1–1 *et seq.,* grants him standing to bring the instant claim. The Statute provides in pertinent part that:

> Sec. 1. Courts of record within their respective jurisdictions have the power to declare rights, status and other legal relations whether or not further relief is or could be claimed. No action or proceeding is open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect. The declaration has the force and effect of a final judgment or decree.

> Sec. 2. *Any person* interested under a deed, will, written contract, or other writings constituting a contract, or *whose rights,* status, or other legal relationships *are affected by a statute,* municipal ordinance, contract, or franchise, *may have determined any question of construction or validity arising under the* instrument, *statute,* ordinance, contract, or franchise *and obtain a declaration of rights,* status, or other legal relations thereunder.

I.C. §§ 34–14–1–1 and 34–14–1–2 (emphasis added).

 In order to obtain declaratory relief, the person bringing the action must have a substantial interest in the relief sought. *Hibler v. Conseco, Inc.,* 744 N.E.2d 1012, 1023 (Ind.Ct.App.2001) (quoting *Town of Munster v. Hluska,* 646 N.E.2d 1009, 1012 (Ind.Ct.App.1995)). At the very least, this person must have the "ripening seeds of a controversy," and a question has arisen affecting such right which ought to be decided in order to safeguard such right. *Town of Munster,* 646 N.E.2d at 1012 (quoting *Morris v. City of Evansville,* 180 Ind.App. 620, 390 N.E.2d 184, 186 (1979)). Accordingly, the basis of jurisdiction under the Declaratory Judgment Act is a justiciable controversy or question, which is clearly defined and affects the legal right, the legal status, or the legal relationship of parties having adverse interests. *Nass v. State ex rel. Unity Team,* 718 N.E.2d 757, 764–65 (Ind.Ct. App.1999), *reh'g denied, trans. denied.*

In *Ad Craft, Inc. v. Area Plan Com'n of Evansville and Vanderburgh Co.,* 716 N.E.2d 6, 15–16 (Ind.Ct.App.1999), *reh'g denied* (quoting *Volkswagenwerk A.G. v. Watson,* 181 Ind.App. 155, 390 N.E.2d 1082, 1084–85 (1979) (internal quotations omitted)), we stated the following justifications for and practical considerations of the Act:

> The purpose of a declaratory action and a declaratory judgment statute is to quiet and stabilize legal relations and thereby provide a remedy in a case or controversy where there is still an opportunity for peaceable judicial settlement. The [Act] is remedial in nature, affording relief · from uncertainty and insecurity with respect to rights, status, and other legal relationships, and is to be liberally construed and administered. Such statute was intended to furnish a

full and adequate remedy where none existed before and it should not be resorted to where there is no necessity for such judgment.

In determining the propriety of declaratory relief, the test to be applied is whether the issuance of a declaratory judgment will effectively solve the problem, whether it will serve a useful purpose, and whether or not another remedy is more effective or efficient. The determinative factor is whether the declaratory action will result in a just and more expeditious and economical determination of the entire controversy.

Here, we note that Bonner is representing a class of "students at elementary or secondary public schools within a school corporation in the State of Indiana." (Appellants' App. p. 18). His declaratory judgment Complaint sought to declare

> [T]he respective rights and duties of [Bonner] and [Appellees], and enter a judgment declaring that the Indiana system of financing elementary and secondary public school education violates the Education Clause, the Due Process Clause and the Equal Protection Clause of the Indiana Constitution ...

(Appellants' App. p. 60). As the statute is remedial in nature, Bonner now alleges that the trial court's power to declare a response to his question falls squarely within the court's jurisdiction under the Declaratory Judgment Act. *See, e.g., Nagy v. Evansville–Vanderburgh School Corp.*, 844 N.E.2d 481 (Ind.2006) (plaintiffs sought declaratory judgment that $20 student service fee violated the Education Clause).

On the other hand, Appellees urge us to characterize Bonner's Complaint as a request for an advisory opinion. They state that courts may declare laws unconstitutional only when the exercise of judicial power is otherwise appropriate. In this case, exercising judicial power would neither be appropriate nor, in all likelihood, effective. Relying on the statutory language of the Declaratory Judgment Act, Appellees point to I.C. § 34–14–1–6 providing that a declaratory judgment is not proper where "the judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding."

■■■ Although the Indiana Constitution contains no "case or controversy" requirement, the federal limits on justiciability are instructive, because the standing requirement under both federal and state constitutional law fulfills the same purpose: ensuring that the litigant is entitled to have the court decide the merits of the dispute or of particular issues. *Hibler*, 744 N.E.2d at 1023. The standing doctrine constitutes a significant restraint upon the ability of Indiana courts to act as it denies courts any jurisdiction absent actual injury to a party participating in the case. *Id.* It restricts the courts to real controversies in which the complaining party has a demonstrable injury. *Id.* In order to establish standing, a plaintiff must demonstrate a personal stake in the outcome of the lawsuit and must show that he has sustained or is in the immediate danger of sustaining some direct injury as a result of the conduct at issue. *Id.*

■ Here, we conclude that Bonner presented us with a controversy which clearly affects his legal rights. In his Complaint, he asserts, in pertinent part, that

> 83. The school corporations where [Bonner] attend school serve a large number of students who are in need of remediation to attain proficiency in the various subject areas that are tested under the ISTEP+ program. However, in the last two years, Indiana has

reduced the amount of funding available for remediation programs by more than 50%. While funding for remediation programs was at a level of approximately $20 million during 2000–04, the amount for 2005 was about $8.2 million and the amount for 2006 was about $9 million. Indiana has allocated about another $5 million per year specifically for remediation on the Grade 10 GQE since 1999. The funding for remediation is grossly inadequate to enable the school corporations where [Bonner] attend school to provide remediation to all of their students who need it.

84. State funding for summer school programs has declined from a level of approximately $21.6 million prior to 2002 to a level of $18.4 million since 2002. Furthermore, the [Board of Education] prioritizes school corporations' summer course offerings and reimburses only "Category 1" courses at 100%. Category 2 courses are reimbursed at not less than 75% and Category 3 courses are reimbursed at a rate determined by the amount of state funding remaining for summer school programs.

85. In addition to the factor in the Complexity Index, the state funds a Non–English Speaking Program to supplement the education of Indiana's limited English proficient students. However, since the Program's inception in 1999–2000, the state's funding has never exceeded $700,000, an insufficient amount to serve more than 25,000 students.

86. The number of limited English proficient students reported in the State of Indiana has more than tripled since the Non–English Speaking Program was initiated in school year 1999–2000, yet the State allocation has remained the same. As a result, state funding of the Non–English Speaking Program, on a per-pupil basis, has steadily declined over the seven years of the Program, from a high of $75 in 1999–2000 to a low of $21.91 in 2005–06.

### CAUSES OF ACTION

#### Count One

*Violation of the Education Clause*

\* \* \*

88. The Education Clause, Article VIII, Section 1, of the Indiana Constitution imposes an enforceable duty on the State of Indiana, through its General Assembly and [Appellees], to establish and maintain a general and uniform system of public education that affords each child attending public school in the State of Indiana an education that meets statewide minimum standards of educational quality and quantity, and, at a minimum, equips each child with the knowledge and skills necessary to succeed in higher education, at work, and in the community as responsible and productive citizens.

89. The Education Clause further imposes an enforceable duty on the State of Indiana, through its General Assembly and [Appellees], to create a general and uniform system of common schools that extends the opportunities and advantages of education equitably to all students attending elementary and secondary public schools throughout Indiana, thereby diffusing knowledge and learning generally throughout the State and among the public school students in Indiana.

90. Indiana's Foundation Program and method of financing its system of public schools is arbitrary and not rationally related to the educational needs of children at risk of educational failure due to poverty, special needs, limited English proficiency and racial or ethnic minority

(as well as those of students participating in vocational education programs.) It was not designed to provide all school corporations with the resources necessary to implement Indiana's academic standards or to provide all of their students, rich and poor, with the constitutionally required education. There is no justification for a school-financing scheme that denies [Bonner] a constitutionally sufficient education and equal educational opportunities and advantages merely because they reside in school corporations with low property wealth or are disadvantaged by poverty, ethnic minority, physical or mental disabilities or limited English proficiency.

91. Indiana's method of financing its public schools violates the Education Clause of the Indiana Constitution by failing to encourage the education of all public school students in Indiana consistent with constitutional standards of quality and quantity and by failing to spread educational opportunities and advantages generally, uniformly and equitably among the various elementary and secondary public schools, thereby failing to diffuse knowledge and learning generally among the children of Indiana.

(Appellants' App. pp. 56–58).

Mindful to accept the allegations raised in the Complaint as true, Bonner's claim is clearly defined as a constitutional challenge under the Education Clause. *See Nass*, 718 N.E.2d at 764–65. Contending that the state's financing is insufficient to provide him, and the members of his Class, with a quality public education that will prepare him to function in a complex society, and to compete successfully with his peers for productive employment and opportunities for higher education, Bonner has a substantial interest in the relief sought. *See Hibler*, 744 N.E.2d at 1023.

Therefore, we affirm the trial court's finding of standing for Bonner.

### B. *Redressability*

Next, Bonner argues that his cause is justiciable as it satisfies the requirement for redressability. Contesting the trial court's determination that it is speculative that his Complaint would effectuate a remedy, Bonner maintains that a declaratory judgment proponed by this court would force the other governmental branches to acknowledge and support the judgment, leading to a revision of Indiana's education in terms of quality and funding. Asserting that there is no reason to expect that Appellees and the General Assembly will refuse to respond appropriately to a declaratory judgment, Bonner additionally focuses on *State ex. Rel. Mass Transp. Auth. Of Greater Indianapolis v. Ind. Revenue Bd.*, 146 Ind.App. 334, 255 N.E.2d 833, 834–835 (1970), *cert. denied*, 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114 (1970), where our supreme court specifically rejected the notion that the judiciary should refrain from action because the elected branches of government might not comply.

In turn, relying on the trial court's determination, Appellees argue that Bonner's asserted lack of educational opportunity is purely speculative and cannot be redressed by any court ruling. Distinguishing Bonner's cited case law, Appellees contend that they are powerless to effect change benefiting Bonner even if they do comply with the court's order. Asserting that Bonner circumvents the redressability issue by assuming that everyone will honor the court's legal rationale, Appellees state the question: if Bonner can sue "the Governor and the Superintendent not because *they* can provide something, but because a favorable ruling is likely to prompt *the General Assembly* to provide something, what is the point of having defendants at all?" (Appellees' Br. p. 29) (emphasis in

original). Alleging that judicial power alone cannot effectuate any meaningful remedy demanded by Bonner, Appellees conclude that adjudicating the Complaint would exceed judicial power.

▉▉▉ We find the purported speculative nature of any possible remedy to be of no effect when dealing with the Declaratory Judgment Act. The Declaratory Judgment Act's statutory language states that "[c]ourts of record within their respective jurisdictions have the power to declare rights, status and other legal relations *whether or not further relief is or could be claimed.*" I.C. § 34–14–1–1 (emphasis added). In *Smith v. Mercer,* 118 Ind.App. 575, 79 N.E.2d 772, 775 (1948), we reiterated this principle and clarified that declaratory judgments do not involve executory or coercive relief and the judgments in such cases are limited to the determination and declaration by such judgment of the rights, status, or relation of the parties. Although Bonner does not request executory relief, it is clear that he envisions the court to explain his rights under the Constitutional Education Clause, in hopes it will spur the General Assembly into action. *See also Brindley v. Meara,* 209 Ind. 144, 198 N.E. 301, 303 (1935) (a declaratory judgment does not involve executory or coercive relief). It is the distinctive characteristic of such declaratory judgment that the declaration stands by itself; that is to say, no executory process follows as of course. By declaring the parties' respective rights and duties pursuant to the Education Clause as requested by Bonner's Complaint, we will terminate the uncertainty giving rise to the current proceeding. *See Ad Craft, Inc.,* 716 N.E.2d at 15–16. By the Act, this declaratory judgment is to have the force and effect of a final judgment or decree.[4]

Appellees' assertion that the General Assembly may ignore the court's judgment interpreting the Indiana Constitution, should not influence our opinion. The judiciary's role of interpreting Indiana's Constitution is at the heart of tripartite government, with separate branches that check and balance one another. Already in 1803, the United States Supreme Court decided in *Marbury v. Madison* that the right to review acts of Congress and actions of the executive in order to determine their constitutionality was a basic and inherent right of the judiciary. *Marbury v. Madison,* 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803). Recognizing their essential role, Indiana courts have been adjudicating constitutional challenges to statutes and other governmental action for almost two centuries. The separation of powers doctrine confers on courts the power and the "bounden duty ... to pass upon the validity of the acts of the General Assembly and to declare them void when in conflict with the Constitution of the State." *Parker v. State ex rel. Powell,* 133 Ind. 178, 32 N.E. 836, 839 (1892), *reh'g denied.* In the case before us, Bonner seeks a determination whether the current school funding system satisfies the requirements of the Education Clause, as included in the Indiana Constitution. Bonner does not ask this court to encroach upon the legislative mandate by imposing a particular, specific school funding system. That task remains squarely within the legislative province.

Moreover, in line with the United State Supreme Court, Indiana courts have spe-

---

4. The essential difference between a declaratory judgment and a purely advisory opinion lies in the fact that the former is a binding adjudication of the contested rights of litigants, though unaccompanied by consequential relief, while the latter is merely the opinion of the judges or court which adjudicates nothing and is binding on no one. *Douglas Oil Co. v. State,* 81 S.W.2d 1064 (Tex.Ct.App. 1935).

cifically rejected the notion that the judiciary should refrain from action because the elected branches of government might not comply. *See State ex rel. Mass Transp. Auth. of Greater Indianapolis*, 255 N.E.2d at 834–35. Our supreme court eloquently phrased it as follows:

This is a government of laws, and all are amenable to it. To the courts, the people have given the power, and charged them with the duty to declare what it is; and this duty cannot be lightly disregarded, however unpleasant and embarrassing it may be. Without the aid of sword or purse, courts have met with little difficulty from disobedience of their decrees, and this has come equally from a generally conscientious discharge of duty by the courts and a respect for the law which is inherent in our people. Where the question presented to a court is a judicial question, it would be sheer, inexcusable cowardice and a violation of duty for it to decline the exercise of its jurisdiction because of a lack of power to enforce its decree if other agencies of government should refuse to comply with it. Moreover, we have no right to reflect on any officer of a co-ordinate department by entertaining the assumption that the law as declared by the courts might be disregarded.

*Ellingham v. Dye*, 178 Ind. 336, 99 N.E. 1, 27 (1912), reh 'g denied.

### C. *Parties*

Lastly, Bonner argues that challenging the constitutional validity of a statutory scheme by bringing a declaratory judgment action against the executive branch official charged with the statute's implementation is a well-recognized approach. Conversely, Appellees assert that the Governor, Superintendent Reed, and the Board of Education are not the proper defendants to the instant suit. Returning to their redressability argument, Appellees contend that even though the Governor and Superintendent administer or enforce educational statutes in some general and unspecified way, they cannot change the current system of education funding. They maintain that as Appellees have done nothing to precipitate the educational funding formula, there is nothing they can do to make it more amenable to Bonner.

### 1. *Governor Daniels*

It is well within the province of the legislature to delegate authority to executive branch officials and administrative agencies. *State Bd. of Tax Comm'rs v. Indianapolis Racquet Club, Inc.*, 743 N.E.2d 247, 251 (Ind.2001). When executive branch officials and agencies act upon delegated authority, their actions are deemed to be the acts of the General Assembly. *Nagy*, 844 N.E.2d 481, 491–92 (Ind.2006). Specifically, the Indiana Constitution has vested the executive power of the State in a Governor. Ind. Const. Art V, § 1. As the State's senior executive officer, Governor Daniels receives recommendations from the Board of Education concerning the educational needs of the state, including financial needs. *See* I.C. § 20–19–2–14. Additionally, he is the Co–Chair of the Education Roundtable, which is charged with making recommendations to the Board of Education regarding the standards for Indiana's public schools.

Furthermore, there is ample precedent where a plaintiff challenges the constitutional validity of a statutory scheme by bringing a lawsuit against the executive branch officials charged with implementing the challenged statutes. *See, e.g., D & M Healthcare, Inc. v. Kernan*, 800 N.E.2d 898 (Ind.2003) (nursing home facilities brought a declaratory action against Governor Kernan contesting the constitutionality of a statute); *Indiana Dep't of Envtl. Mgmt. v. Twin Eagle, LLC*, 798 N.E.2d

839 (Ind.2003) (State Department of Environmental Management was a defendant in a declaratory judgment action by developer seeking declaration that environmental laws passed by the legislature were unconstitutional); *Villegas v. Silverman,* 832 N.E.2d 598 (Ind.Ct.App.2005), *reh'g denied, trans. denied* (Commissioner of Indiana Bureau of Motor Vehicles, an executive entity, was the defendant in a declaratory judgment action by illegal aliens challenging the constitutionality of requirements for obtaining driver licenses and identification cards).

Accordingly, unlike the trial court, we conclude that Governor Daniels was properly named as a defendant in this case.

### 2. *Superintendent Reed*

■■■ We reach a similar conclusion with regard to Superintendent Reed. Dr. Reed, as the head of the Department of Education, is responsible for supervising all elementary and secondary education, including the overall development, implementation and monitoring of the ISTEP+ program and the financing of elementary and secondary public education. Dr. Reed is also the Co–Chair of both the Board of Education and the Education Roundtable. Thus, we reverse the trial court's decision with regard to Superintendent Reed.

### 3. *Board of Education*

■■■ Concerning the Board of Education, Appellees maintain that even though the Board establishes educational goals and advises the Governor and General Assembly on the State's financial educational needs, it is powerless to remedy Indiana's school-funding formula. Pursuant to I.C. § 20–19–2–14, the Board of Education is charged with: (1) establishing the educational goals of the State, developing standards and objectives for local school corporations; (2) assessing the attainment of the established goals; and (3) making recommendations to the Governor and General Assembly concerning the educational needs of the State, including its financial needs. Additionally, I.C. § 20–19–2–8(a)(7) requires the Board of Education to adopt rules concerning the distribution of funds and revenues appropriated for the support of schools in the State. We agree with the trial court's determination that the Board is a proper defendant because the General Assembly delegated its powers directly related to the funding of public schools.

In sum, we conclude that Bonner properly brought his declaratory judgment action. Mindful to accept all allegations in Bonner's Complaint as true, Bonner has presented us with a question to define his legal rights under the Constitution's Education Clause. *See Nass,* 718 N.E.2d at 764–65. In line with a declaratory action's purpose, our response will afford relief from uncertainty and will serve a useful purpose. *See Ad Craft, Inc.,* 716 N.E.2d at 15–16.

### III. *Judicially Enforceable Guidelines*

Disputing the trial court's determination that the cause cannot proceed because there is no reasonably clear standard for interpreting the Education Clause, Bonner reflects on the article's rich history, language, and case law to garner guidelines in order to enforce the constitutional provision. On the other hand, the Appellees generalize that "broadly worded" provisions of the Indiana Constitution are "not subject to judicial enforcement." (Appellees' Br. p. 34).

■■■ The Education Clause, encapsulated in Article VIII, § 1 of the Indiana Constitution provides:

> Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; it shall be the duty of the

General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all.

Generally, questions arising under the Indiana Constitution are to be resolved by examining the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our Constitution, and case law interpreting the specific provisions. *Ratliff v. Cohn*, 693 N.E.2d 530, 534 (Ind. 1998), *reh'g denied*. As our supreme court explained, a review of state constitutional claims requires:

a search for the common understanding of both those who framed it and those who ratified it. Furthermore, the intent of the framers of the Constitution is paramount in determining the meaning of a provision. In order to give life to their intended meaning, we examine the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our Constitution, and case law interpreting the specific provisions. In construing the Constitution, we look to the history of the times, and examine the state of things existing when the Constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy. The language of each provision of the Constitution must be treated with particular deference, as though every word had been hammered into place.

*McIntosh v. Melroe Co.*, 729 N.E.2d 972, 986 (Ind.2000) (quotation marks and citations omitted).

■ In this light, we are mindful of "our role as guardian of the Constitution," and the requirement that "[j]udges must enforce the Constitution as written and intended." *Bunker v. Nat'l Gypsum*, 441 N.E.2d 8, 11 (Ind.1982); *Bd. of Trustees of Pub. Employees' Retirement Fund of Ind. v. Pearson*, 459 N.E.2d 715, 717 (Ind.1984). Consequently, "[w]here a law or the application of a law is challenged on constitutional grounds, the judiciary has the authority, as well as the duty, to explore the constitutional ramifications of the law." *City of Anderson v. Assoc. Furniture and Appliances, Inc.*, 423 N.E.2d 293, 295 (Ind. 1981).

### A. A Reasonably Clear Standard

■ Appellees build their argument on the absence of a reasonably clear standard against which to evaluate the school-funding formula. They assert that when no independent, neutral standards exist, courts cannot review legislative decisions without inherently engaging in legislative policymaking. We disagree.

On numerous occasions Indiana courts have developed standards for enforcing constitutional provisions that are sparse and require further interpretation. In *Boehm v. Town of St. John*, 675 N.E.2d 318, 319–20 (Ind.1996), taxpayers brought a declaratory judgment action against the State Board of Tax Commissioners challenging the State's method for assessing the value of real property for tax purposes as violating Article X, § 1(a) of the Indiana Constitution. The contested article reads, in part, as "[t]he General Assembly shall provide, by law, for a uniform and equal rate of property assessment and taxation and shall prescribe regulations to secure a just valuation for taxation of all property, both real and personal." Ind. Const., art. X, § 1(a). Like Appellees here, the State Board of Tax Commissioners argued that the taxpayers' claims were not justiciable because there are "no judicially-manageable standards permitting

adequate review of the legislative choices." *Id.* at 321. Mindful of the separation of powers, the *Boehm* court, nevertheless, refused to "permit excessive formalism to prevent necessary judicial involvement." *Id.* at 322. Reviewing the language and the history of the Taxation clause, our supreme court rejected the State Board's argument and stated that the clause "does not immunize legislative policy judgments from judicial oversight, but rather establishes mandatory minimum requirements for our system of property assessment and taxation." *Id.* at 324.

In the context of the Education Clause, there exists a long line of precedential case law, interpreting the specific language of the Article. In these previous cases, we have never declined to resolve a constitutional challenge due to a lack of judicially manageable standards. In *State ex. rel. Clark v. Haworth*, 122 Ind. 462, 23 N.E. 946, 947–48 (1890), our supreme court determined that a state statute governing a school's textbooks was within the power of the Legislature pursuant to the Education Clause. Furthermore, in *Robinson v. Schenck*, 102 Ind. 307, 1 N.E. 698, 705 (1885), the court interpreted the "by all suitable means" language of the Education Clause and established it required the Legislature to adopt the best system to levy taxes to "supply the wants of the local schools and *make them useful and effective.*" (emphasis added). The court further held that the phrase "general and uniform" prohibited the Legislature from making unequal distribution of moneys derived from a general levy or from granting to some school corporations benefits or rights withheld from others. *Id.*

More recently, in *Nagy v. Evansville–Vanderburgh School Corp.*, 844 N.E.2d 481, 484–89 (Ind.2006), our supreme court interpreted the phrase "tuition shall be without charge" with regard to the imposi-

tion by the school district of a $20 activities fee. In its analysis, the *Nagy* court elaborately explored the historical development of common schools to reach its determination that a mandatory fee generally imposed on all students amounts to a charge for attending a public school. *Id.* at 493. The court held that this charge contravenes the "common schools" mandate as "the term is used in the Education Clause." *Id.*

Closely related to their first argument, Appellees raise as an additional assertion that we are prohibited from reviewing Bonner's claim because school funding lies exclusively within the dominion of the legislature and is unsuitable for judicial review. They maintain that a review of Bonner's claim would force us to assume a legislative function by substituting our own judgment as to how school-funding needs can best be met. Again, we disagree.

Bonner does not request this court to establish a new system of educational funding. Rather, Bonner's argument is premised on the interpretation that the Education Clause requires the General Assembly to provide for a quality education and whether the legislature has satisfied this duty with the current system of educational finance. While courts must not interfere with the General Assembly's proper exercise of its constitutional prerogative to determine public policy and to enact legislation in furtherance thereof, the judiciary is obligated to enforce our state constitution's provisions regarding legislative action. *Boehm*, 675 N.E.2d at 322. In *Parker*, 32 N.E. at 839, our supreme court clarified:

> If this were a case in which the appellee sought to compel the general assembly to district the state in a particular manner ... we would hold without hesitation that we had no jurisdiction over the matter ... The most courts can do is, in

a proper case, to pass upon the validity of a law enacted for that purpose, and if such law is found to be in conflict with the constitution of the state, declare it invalid, leaving the legislature free to enact one that does conform to the constitution.

Thus, while we agree with Appellees that the specific method of funding education is within the legislature's realm, nevertheless, in the discharge of our constitutional obligations, we may be required to determine whether the legislative action is constitutionally valid.

Clearly, as shown, the Education Clause is subject to judicial enforcement. As such, in our quest to interpret Article VIII of our State's constitution, we turn to the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our Constitution, and case law interpreting the specific provisions. *See Ratliff,* 693 N.E.2d at 534.

### B. *History*

Our review of the Education Clause's historical birth indicates the centrality of education to civic life in Indiana. Examining the Constitution in the context of the history surrounding its drafting and ratification, the delegates' debates clearly indicate a strong necessity to create a public education system. On December 7, 1846, prior to the second Constitutional Convention, Professor Caleb Mills, a professor at what was later to become Wabash College, and often referred to as the "father of the Indiana common school system," argued, among other things, that all of Indiana's children were deserving of a quality education "without distinction of rank or color." Caleb Mills, *An Address to the Legislature of Indiana at the commencement of its Session* (December 7, 1846), reprinted in Charles W. Moores, *Caleb Mills and the Indiana School System* 400, 404 (1905).

During the antebellum period, the General Assembly recognized the problems with Indiana's high illiteracy rate and inadequate educational system and attempted to address these during its second Constitutional Convention in 1850.

During the second Constitutional Convention, a special committee was assembled to specifically address the shortcomings of the education provision contained in the 1816 Constitution. There was considerable debate during the convention regarding the educational provisions of the proposed new Constitution, particularly regarding the funding of the common school system. Delegate Read of Monroe County, speaking in support of establishing an office of Superintendent of Schools, stated:

> The education of every child in the State has become simply a political necessity. It is a necessary measure of defense and self-preservation. We *must*—yes, sir, I repeat it, we *must* have a better devised and more efficient system of general education. On this subject there can be but one opinion in this body, and indeed, among the people of the State at large.

2 REPORT OF THE DEBATES AND PROCEEDINGS OF THE CONVENTION FOR THE REVISION OF THE CONSTITUTION OF THE STATE OF INDIANA 1850, at 1858 (1850) (hereinafter DEBATES) (emphasis in original).

Another delegate, Mr. Bryant of Warren County, discussed the State of Indiana's education based on the 1840 and 1850 census:

> In 1840, by the census then taken, this State, which we boast of here, as being the fifth State of the Union, in size and population, was clearly proven to be the most ignorant *of all the free States,* and far, very far, *behind many of the slave States.* We had then thirty-eight thousand one hundred persons over the age

of twenty years, who could neither read nor write. The friends of education were startled into action, they assembled in Conventions at our State Capital, and declared that it was our true policy to adopt some system of general education in accordance with that marked out by the framers of our present Constitution, and that then we should have an efficient system.

\* \* \*

I awaited the taking of the census in 1850, with much anxiety, to ascertain what the measure of our progress was. We know now what our condition is, and it is proper that this Convention should know and ponder upon it. Sir, we have forty thousand voters in our State, who cannot read the ballots which they use. (Marked sensation.) Yes, sir, and thirty thousand mothers who are rearing our successors and destitute of the very first elements of education. We have, sir, according to the late census, (extracts from which I hold in my hand,) seventy-three thousand two hundred and ninety-nine persons over the age of twenty years, who cannot read and write.

\* \* \*

If the present Constitution be correct in asserting that "knowledge and learning generally diffused through a community, (is) essential to the preservation of a free government," what have we a right to expect from the state and condition of learning among us?

DEBATES at 1890–91 (emphasis in original). Following Mr. Bryant's eloquent explanation of the state of education in 1850, delegate Allen, of the districts of Carroll and Clinton, clarified that:

Sir, if there is any cause that should call to its aid the universal sympathies and unflinching support of this people, it is the cause of common schools. We should cherish it as one of the strongest safeguards of human freedom; we should encourage it by every legitimate means in our possession; and we should not stay our efforts until we shall have placed within the reach of every child within the State, poor or rich, the means of a common school education. When we have done this, we shall have accomplished more for the cause [of] humanity, more for the safety of our free institutions, more for the perminence [sic] and security of society, than by any other act of legislation which we could adopt.

DEBATES at 1892.

In light of this historical context, as reported in the debates, we can say with some certainty that "the evil to be addressed by what became Article [VIII] of our Constitution was a lack of education and the subsequent problem of illiteracy among Indiana's citizens." *Nagy v. Evansville–Vanderburgh School Corp.*, 844 N.E.2d 481, 484 (Ind.2006) (citing *Nagy v. Evansville–Vanderburgh School Corp.*, 808 N.E.2d 1221, 1227–28 (Ind.Ct.App.2004)). Based on the discussions during the Convention, attempts were made to improve the results from the 1840 and 1850 census. Providing an efficient education to all Indiana's children, a goal which the 1816 Constitution had failed to reach, became the objective of the framers of our current Constitution.

Reflecting on the Education Article's history, Appellees now argue that the clause should not be enforced because in 1850 there was not "a rich tradition" of judicial review. A cursory review reveals otherwise. Even though after the ratification of the new Constitution, the controversies arising under Article VIII mainly dealt with the issues surrounding school funding, not whether Article VIII requires

the general assembly to provide an efficient education, Indiana courts reviewed and interpreted the Education Clause. *See, e.g., Greencastle Township v. Black,* 5 Ind. 557 (1854) (local township tax to pay expenses of local commons schools and the state statute which authorized such were unconstitutional because the uniformity of the common school system would be destroyed); *Adamson v. Auditor & Treasurer of Warren County,* 9 Ind. 174 (1857) (although statutes conferring to township trustees the power to tax must be general, exercise of such power need not be uniform throughout the State); *Shepardson v. Gillett,* 133 Ind. 125, 31 N.E. 788 (1892) (rejecting a claim that the statute which authorized trustees of incorporated towns to levy taxes for the support of town schools within their corporations was unconstitutional). Thus, unlike Appellees, we do find there to be a rich tradition of judicial review stemming from the early years of the Article's ratification to today.

### D. *Sister States*

Although our supreme court has interpreted the first section of the Education Clause on several occasions since its inception, the court has never analyzed the precise issue at hand. However, judging from the flood of out-of-state cases quoted by the parties and incorporated in the Amicus brief, the current cause is part of an orchestrated suit, already filed and decided in several states. Essentially, in the last thirty years, constitutional challenges to public school financing systems have been filed in all but a handful of states.[5] The vast majority of these courts have exercised their judicial responsibility to interpret their state constitutional provision, relying extensively on historical records and the intent of the framers. In fact, these courts have considered whether their school funding systems pass constitutional muster, and most of these decisions have addressed the constitutional adequacy of school funding systems.

Specifically, during the past ten years, only eight states have refused to consider challenges similar to the case before us;[6] whereas, seventeen states have adjudicated the claims.[7] Nevertheless, compared to

---

5. To date cases have not yet been filed in five states: Hawaii, Nevada, Utah, Mississippi, and Delaware.

6. *Ex parte James,* 836 So.2d 813, 819 (Ala. 2002); *Lobato v. State,* No. 06–CA–0733, slip op. at 34, —— S.W.3d ——, —— (Colo.Ct.App., Jan.24, 2008); *Coalition for Adequacy & Fairness in School Funding, Inc. v. Chiles,* 680 So.2d 400, 406–07 (Fla.1996); *Lewis E. v. Spagnolo,* 186 Ill.2d 198, 238 Ill.Dec. 1, 710 N.E.2d 798, 802 (1992); *Nebraska Coalition for Educational Equity & Adequacy v. Heineman,* 273 Neb. 531, 731 N.W.2d 164, 183 (2007); *Oklahoma Education Ass'n v. State,* 158 P.3d 1058, 1066 (Okla.2007); *Marrero v. Commonwealth,* 559 Pa. 14, 739 A.2d 110, 111–113 (1999); *City of Pawtucket v. Sundlun,* 662 A.2d 40, 58–59 (R.I.1995).

7. *Lake View School No. 25 v. Huckabee,* 351 Ark. 31, 91 S.W.3d 472, 484–85 (2002); *Idaho Schools for Equal Educational Opportunity,* *Inc. v. Evans,* 123 Idaho 573, 850 P.2d 724, 734 (1993); *Unified School Dist. No. 229 v. State,* 256 Kan. 232, 885 P.2d 1170, 1186 (1994); *Rose v. Council for Better Education, Inc.,* 790 S.W.2d 186, 209 (Ky.1989); *McDuffy v. Secretary,* 415 Mass. 545, 615 N.E.2d 516, 555 (1993); *Columbia Falls Elementary School District No. 6 v. State,* 326 Mont. 304, 109 P.3d 257, 259–61 (2005); *Claremont School District v. Governor,* 138 N.H. 183, 635 A.2d 1375, 1381 (1993); *Abbott v. Burke,* 149 N.J. 145, 693 A.2d 417, 428 (1997); *Campaign For Fiscal Equity, Inc. v. State,* 86 N.Y.2d 307, 631 N.Y.S.2d 565, 655 N.E.2d 661, 665 (1995); *Leandro v. State,* 346 N.C. 336, 488 S.E.2d 249, 252–54 (1997); *DeRolph v. State,* 677 N.E.2d 733, 737 (Ohio 1997); *Abbeville Cty. School District v. State,* 335 S.C. 58, 515 S.E.2d 535, 540 (1999); *Neeley v. West Orange–Cove Consolidated Independent School District,* 176 S.W.3d 746, 776–77 (Tx. 2005); *Seattle School District No. 1 of King Cty. v. State,* 90 Wash.2d 476, 585 P.2d 71, 84

many state education clauses, Indiana's is more expansive and provides the court with more information to delineate the constitutional standard.[8] In *Claremont School District v. Governor*, 138 N.H. 183, 635 A.2d 1375 (1993) (*Claremont I*), the New Hampshire supreme court interpreted an education clause that is far less directive than Indiana's constitutional mandate. Part II, Article 83 of the New Hampshire constitution reads in pertinent part: "Knowledge and learning, generally diffused through a community, being essential to the preservation of a free government; and spreading the opportunities and advantages of education through the various parts of the country, ..., it shall be the duty of the legislatures and magistrates, ... to encourage private and public institutions ..." *Id.* at 1377. Relying upon its rich constitutional history, the *Claremont I* court held that the clause's language imposed a duty on the state to provide an adequate education to every educable child in the public schools and to guarantee adequate funding. *Id.* at 1375. Nevertheless, it cautioned that it is for the Legislature and the Governor to fulfill their responsibility with respect to defining the specifics of, and the appropriate means to provide through public education, the knowledge and learning essential to the preservation of a free government. *Id.* at 1381.

Following *Claremont I*, the New Hampshire supreme court was called upon to determine whether a State-funded constitutionally adequate elementary and secondary education is a fundamental right. *Claremont School District v. Governor*, 142 N.H. 462, 703 A.2d 1353, 1358 (N.H. 1997) (*Claremont II*). Noting that the right to an adequate education mandated by the constitution is not based on the exclusive needs of a particular individual, but rather is a right held by the public to enforce the State's duty, the court held that a constitutionally adequate public education is a fundamental right. *Id.* at 1359. In the absence of legislative action in the wake of *Claremont I*, the *Claremont II* court attempted to define the concept of an adequate public education and, building upon out-of-state case law, proposed certain guidelines as benchmarks. *Id.* Nonetheless, mindful of its own caution as stated in *Claremont I*, the court premised its proposed definition on the anticipation "that [the other branches of government] will promptly develop and adopt specific criteria implementing these guidelines and, in completing their task, will appeal to a broad constituency." *Id.* Similar to the *Claremont II* court, a number of courts in sister jurisdictions have articulated minimum constitutional standards of educational quality.[9]

---

(1978); *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859, 870 (1979); *Vincent v. Voight*, 236 Wis.2d 588, 614 N.W.2d 388, 396 (2000); *Campbell Co. School District v. State*, 907 P.2d 1238, 1264 (Wyo.1995).

8. *See, e.g.,* Ky. Const. § 183 ("The General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State."); N.C. Const. Art. IX, § 2 ("The General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal op-

portunities shall be provided for all students."); N.Y. Const. Art. X, Section 1 ("The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated.").

9. One of the most notable of these cases, and the most frequently cited, is Kentucky's supreme court opinion in *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky.1989), which after a lengthy court battle, declared its entire system of common schools unconstitutional. In *Rose*, the supreme court articulated constitutional standards of educational

## D. *Conclusion*

■ Commencing with Indiana's Education Clause, and interpreting it in light of the clause's historical mandate and our sister states' persuasive precedents, we hold that Article VIII imposes a duty on the State to provide an education that equips students with the skill and knowledge enabling them to become productive members of society. Article VIII, § 1 reads:

> Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all.

Thus, the Education Clause is a single sentence provision that initially articulates the premise that "knowledge and learning generally diffused through a community [is] essential to the preservation of a free government." From that opening premise, the sentence continues that "it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement." Concluding, the Education Clause adds that it is also the duty of the General Assembly "to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all." All parts of this article are clearly interrelated. The "knowledge and learning" refers to the "moral, intellectual, scientific and agricultural improvement," and one of the "suitable means" by which to "encourage" such "improvement" is a "general and uniform system of Common Schools." The purpose of these schools is so "essential to the preservation of a free government" that the General Assembly will provide "tuition without charge and equally open to all."

Considering the general spirit of the times and the prevailing sentiments of the people, it is apparent from the historical

---

quality, known as the *Rose* factors. *Id.* at 212. These *Rose* factors state:

> A child's right to an adequate education is a fundamental one under our Constitution. The General Assembly must protect and advance that right. We concur with the trial court that an efficient system of education must have as its goal to provide each and every child with at least the seven following capacities: (i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable the student to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreci-

ate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market.

The Rose factors have been explicitly adopted by three other supreme courts: *McDuffy v. Sec'y of Executive Office of Educ.*, 415 Mass. 545, 560, 615 N.E.2d 516 (1993); *Claremont School District v. Governor*, 142 N.H. 462, 703 A.2d 1353, 1359 (1997); and *Lake View School No. 25 of Phillips Cty. v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472, 487–488 (2002). Several other states have been influenced by them: *see, e.g., Opinion of the Justices*, 624 So.2d 107, 155 (Ala.1993) and *Abbeville Co. School District v. State*, 335 S.C. 58, 515 S.E.2d 535, 540 (S.C.1999).

record that those who drafted and ratified Article VIII refused to accept a stagnant form of education. Rather, our society, through its delegates at the Second Convention, placed a tremendous value on learning. It was recognized that education provides the key to individual opportunities for social and economic advancement and forms the foundation for our democratic institutions and our place in the global economy. The very existence of government was declared by the framers to depend upon the knowledge and learning of its citizens. In this light, they argued for an efficient system of general schools that would prepare its citizens to become productive members of society. Not only did they impose a requirement to establish public schools, they also made it the Legislature's duty to encourage by all suitable means intellectual improvements.

Given the complexities of our society today, the State's constitutional duty necessarily must extend beyond mere reading, writing, and arithmetic. It also includes broad educational opportunities needed in today's society to prepare citizens for their role as participants and as potential competitors in today's marketplace of ideas. *See Claremont I,* 635 A.2d at 1381. As such, a constitutionally-mandated public education is not a static concept removed from the demands of an evolving world. Mere competence in the basics—reading, writing, and mathematics—is insufficient in the beginning days of the Twenty–First Century to insure that this State's public school students are fully integrated into the world around them. A broad exposure to the social, economic, scientific, technological, and political realities of today's society is essential for our students to compete, contribute, and flourish in Indiana's economy.

Turning to the allegations of Bonner's Complaint, it is clear that the system cre-

ated by the General Assembly recognizes the need for an education that meets modern requirements. Although the current system has defined some educational standards to calculate the success of its students meeting these requirements, at the same time, it is also understood that more finances need to be directed to some students and some schools because of their circumstances. Notwithstanding the efforts of Indiana's educational system, Bonner claims that as a result of the General Assembly's school funding system, he and his class of similarly situated students do not get the resources to attain the type of education envisioned by the framers of the Education Clause.

We find that Bonner has made a cognizable claim that can be considered by the court. Assuming Bonner can submit proof of his claim, a court can grant a declaration that the General Assembly has not discharged its duty. Ultimately, what constitutes an education that is commensurate with contemporary requirements and which instills skill and knowledge into our students is a matter of fact subject to proof. Likewise, the effect of the General Assembly's current school financing system on attaining an education as envisioned by the Education Clause is a matter of fact subject to proof.

We hasten to add that it is not our intention to intrude upon the prerogatives of other branches of government. We were not appointed to establish educational policy, nor to determine the proper way to finance its implementation. We leave such matters to the two co-equal branches of government: it is for the Legislature and the Governor to fulfill their responsibility with respect to defining the specifics of, and the appropriate means to provide a public education, which should instill in Indiana's children the knowledge and learning essential for today's workplace.

Today, we reverse the trial court's Order and remand back to determine whether Indiana's current public school system through its funding provides our students with an education, as envisioned by the framers of our Constitution.

## CONCLUSION

Based on the foregoing, we find that the trial court erred in dismissing Bonner's cause as his claim is clearly justiciable and subject to judicial review and, additionally, we find that the Education Clause, encapsulated in Article VIII, § 1 of the Indiana Constitution, provides Indiana's children with the right to a public education, as envisioned by the framers of our Constitution.

We reverse and remand for further proceedings pursuant to this decision.

SHARPNACK, J., concurs.

FRIEDLANDER, J., dissents with opinion.

FRIEDLANDER, Judge, dissenting.

I disagree with the Majority's conclusions that (1) the Education Clause encapsulates judicially discernible standards against which the appellants' claims may be measured and (2) the judiciary should be the arbiter of disputes between the citizens of Indiana and their elected officials concerning the allocation of funds for public education. Therefore, I respectfully dissent.

I need not wax long or eloquent to explain the basis of my dissenting view. Put plainly, it is rooted in the separation of powers doctrine, which our Supreme Court has observed, "ensures that the fundamental functions of each branch of government remain inviolate." *Bonney v. Indiana Finance Authority*, 849 N.E.2d 473, 482 (Ind. 2006). Specifically relevant to this controversy, "[t]he legislative branch generally has control over appropriations. While we may find [the legislature's appropriations decision] to be intolerable, we would find it even more intolerable for the judicial branch of government to invade the power of the legislative branch." *Id.* In my view, this is exactly what this court is asked to review in this case—an appropriations decision by the legislature.

Long ago, in *Robinson v. Schenck*, 102 Ind. 307, 1 N.E. 698 (1885), our Supreme Court addressed a somewhat different challenge filed by Indiana citizens with respect to legislative decisions made under the Education Clause. The difference between that challenge and this is not relevant for my purpose here, as the judicial response to both should be the same. In *Robinson*, the Supreme Court articulated it thus:

> This provision imperatively enjoins the general duty upon the legislature, but leaves to them much discretion as to the selection of means for the efficient performance of that duty; and if the local agencies of government are employed to assist in building up the school system, there is no evasion of duty by the legislature. The legislature may, in their discretion, support all the schools of the state by means of a general levy directly made by a legislative act, or they may thus provide for part of the expense of maintaining the schools, or they may delegate to local officers the power to levy such taxes as in their judgment may be needed to supply the wants of the local schools and make them useful and effective. *The duty rests on the legislature to adopt the best system that can be framed; but they, and not the courts, are to judge what is the best system.*

*Id.* at 705 (emphasis supplied).

I believe the appellants' lawsuit in this case asks us to sit in judgment of decisions

made by the Indiana Legislature that are firmly within the discretion accorded to that body by the Education Clause. Upon the same rationale articulated by our Supreme Court in *Robinson*, I would hold that such action is beyond our purview.